(74 Misc. Rep. 596.)

### PEOPLE v. SANTA CLARA LUMBER CO. et al.

(Supreme Court, Trial Term, Hamilton County. December, 1911.)

1. COMPROMISE AND SETTLEMENT (§ 23*)—FRAUD—EVIDENCE.
     In an action to vacate a judgment based upon a settlement between the parties, evidence *held* insufficient to show that the settlement was obtained by fraud or collusion.
     [Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 91–94; Dec. Dig. § 23.*]

2. WOODS AND FORESTS (§ 8*)—FOREST PRESERVES—TITLE.
     Laws 1897, c. 220, § 20, as amended by Laws 1898, c. 135, § 1, authorizing the forest, fish, and game commissioner to institute, prosecute, and settle actions to determine the title to lands claimed by the state as part of the forest preserve, gives him authority to make a settlement whereby adverse claimants receive the soft wood standing on the lands, with the right to cut and remove it, and release to the state all further interest in the lands, and grant to the state neighboring lands to which it made no claim of title.
     [Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

3. CONSTITUTIONAL LAW (§ 43*)—CONCLUSIVENESS—MATTERS CONCLUDED.
     In the absence of fraud or collusion, a judgment based upon a settlement between the state and adverse claimants of lands claimed by the states as part of the forest preserve is binding upon the state, where the settlement has been performed on the part of the adverse claimants, though the terms of the settlement had been arranged before the suit was instituted, and the statute on which it was based was declared unconstitutional after the judgment.
     [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 41; Dec. Dig. § 43.*]

4. CONSTITUTIONAL LAW (§ 43*)—CONSTRUCTION AND OPERATION—RIGHT TO QUESTION CONSTITUTIONALITY.
     When a statute under which a judgment is rendered between the parties to a controversy is subsequently declared unconstitutional, the conclusiveness of the judgment is not impaired by such adjudication.
     [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 41; Dec. Dig. § 43.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by the People against the Santa Clara Lumber Company and others to vacate and set aside a stipulation, order, and judgment. Complaint dismissed.

John T. Norton, Deputy Atty. Gen. (John H. Burke and Benjamin McClung, of counsel), for the People.

Edward M. Angell, for defendant Ostrander.

Ernest P. Hoes, for defendant Santa Clara Lumber Co.

VAN KIRK, J. This action is brought to vacate and set aside a stipulation, order, and judgment, made and entered in an action brought in 1904 by the Forest, Fish, and Game Commissioner, in which the people of the state of New York were plaintiff and the Santa Clara Lumber Company, George R. Finch, and George N. Ostrander were defendants, to have determined the title to certain lands in Hamilton and Essex counties, on the ground that said stipulation, order, and judgment were procured by fraud practiced by the defendants upon the Forest, Fish, and Game Commissioner, by collusion between the defendants and the Forest, Fish, and Game Commissioner, and as the result of a conspiracy to procure the soft timber upon the said lands. In its complaint in this action the plaintiff claims that it has been the owner of the said premises since prior to 1894; that the defendants in the said 1904 action had induced the Forest, Fish, and Game Commissioner to begin said action with the intent and purpose of procuring the settlement which resulted in the stipulation, order, and judgment.

It is stipulated that the questions to be determined here are whether or not said judgment in said action of 1904, entered in Hamilton county November 8, 1904, shall be vacated; and, if vacated, whether or not the lands in question belong to the state.

[1] There are two reasons urged why the judgment of 1904 should be vacated and set aside: First, because it was procured by fraud and collusion; second, because no authority existed in any one to make, on behalf of the state, the stipulation or the settlement which was made in said action of 1904. The charges of fraud and collusion are based largely upon the proposition that the defendant Ostrander, who is an attorney, and who was an expert as to land titles in the Adirondacks, falsely and fraudulently represented and claimed that the defendants or some of them owned the lands in question. The defendants assert that at all times they have claimed to own the lands in question, and that they made the claim in good faith. It is therefore important to determine, first, whether or not the defendants asserted title to said premises in good faith, and believing that they owned the right and interest which they claimed to own; and the chief fact bearing upon this determination is whether or not the condition of the title to the premises in question, at the time the action of 1904 was begun, was such that an attorney at law and his clients might reasonably and honestly believe that he or they owned said premises. The lands in question are in Hamilton and Essex counties, between the north line of the allotments of township 50 of Totten & Crossfield's Purchase, as made by John Richards in 1809,

which is coincident with the Brodhead line, so-called, and the Campbell, Mitchell, and Wright line, which is claimed by the plaintiff to be the south line of McComb's Purchase. This piece of land has been called a gore and it contains about 2,000 acres. It is within the general limits of the Adirondack park; and, if the property of the state, is a part of the forest preserve. There is much evidence in the case bearing upon the title to the lands in question, a brief reference to which will be helpful in determining the good faith of the defendants' claim to said title.

The north line of township 50 is the north line of Totten & Crossfield's Purchase. Township 50 was never patented as a township, but a statute was passed (Laws of 1808, c. 102), under which this township was plotted into lots, to the end that said lots should be sold and the proceeds of said sales be used for the "Improvement of a road lately cut" from the town of Chester, Essex county, to the town of Canton, St. Lawrence county. The said statute, in section 3 thereof, contains the following:

"That, for the purpose of raising an additional sum of five thousand dollars to be employed for the same purpose [the improvement of said road] under the said commissioners, the said surveyor general is hereby required to sell at public auction and at the time and place before mentioned so much of the public lands of the people of this state, through or near which the said road may pass, as shall be sufficient, after paying the expenses of surveying the same into lots, to raise the said sum of five thousand dollars."

And again, in section 4:

"That the said surveyor general cause the said last-mentioned lands to be previously surveyed into lots of half a mile square, as near as the situation of the country will admit."

The said township was then plotted by John Richards in 1809 to the said Brodhead line and no farther; so that, if the said township actually extended to the Wright line, the strip of land northerly of the allotment and southerly of the Wright line was left unplotted. Township 50 was described as bounded upon the north by McComb's Purchase. When the patent for the McComb's Purchase was made by the state, the only line run upon the land and marked upon the land between McComb's Purchase and township 50 was the Brodhead line. Remembering, therefore, that Richards was instructed to plot township 50, that he plotted only to the Brodhead line, that township 50 was described as bounded upon the north by McComb's Purchase, there was certainly reasonable ground for a man who owned that part of McComb's Purchase which was immediately north of township 50 to claim that his lands extended down to the Brodhead line; in other words, that the Brodhead line was the north line of Totten & Crossfield's Purchase at this point, as it is along the southerly side of the Military Tract. Upon the official maps to the present day, there is a line, which is an extension of the southerly boundary of the Military Tract, running to the westerly side of township 50, which line coincides with the northerly line of the allotments of township 50 made by John Richards. From the description of Totten & Crossfield's Purchase and the surveys thereof, it is plain that the north line of Totten & Crossfield's Purchase was intended to be a straight

line; and it is a fact that south of the Military Tract it coincides with the Brodhead line. In 1864, one Burhans procured a quitclaim deed from the state of lands in the north part of township 47, in which deed the Brodhead line is stated to be the south line of Mc-Comb's Purchase. There are very many elements in the evidence, which I have listened to with the closest attention, which show that it was not an unreasonable claim, and by no means necessarily a dishonest claim that one should have made, who owned the south side of the McComb's Purchase opposite township 50, that his lands extended to the Brodhead line opposite township 50. It was not until 1904 or 1905 that the boundary line between Essex and Franklin counties was fixed as the Campbell, Mitchell, and Wright line. Up to that time there had been a dispute as to whether the southern boundary between Franklin and Essex counties was the Brodhead, or the Campbell, Mitchell, and Wright line. I have recently decided a case involving the "gore," so-called, across the north side of township 47, which adjoins township 50 on the east, but the said decision was not made until 1911. In that case the source of title of the Totten & Crossfield's Purchase was traced from the Indians through the British Crown and through the state of New York. It appeared that township 47 had been patented by the state as a whole. It was claimed in that action by the state that the north line of township 47 and the north line of Totten & Crossfield's Purchase coincided, but that, in the description in the patent of township 47, the entire township was not included, but this court construed that patent to cover the entire township as laid out on the maps filed in the office of the Secretary of State; that is, that the north line of the lands patented as township 47 was coincident with the north line of Totten & Crossfield's Purchase. The court accepted the location of the line on the ground as claimed by the state, but this was not essential to the decision. The material question was whether or not said two lines coincided. In this action the state claims no title to any part of McComb's Purchase.

When we consider what was said and done in connection with the settlement between the state and the defendants in the action of 1904 and in connection with the condition of the title as it then stood, we do not find evidence of fraud or collusion. The defendant Santa Clara Lumber Company had persistently, from 1892, claimed this property; it being the owner of lot 26 of McComb's Purchase, which is next northerly of 50. This defendant had posted it, placing signs declaring their ownership and forbidding trespass. They had cut logs or timber on the lands in question. In 1903 or 1904 Col. Fox had spoken to Mr. Ostrander about including the premises in question on the maps among the lots colored as state lands and again had told Mr. Ostrander that the Santa Clara Lumber Company had trespassed upon these lands, and they were considering the matter of bringing suit. In conversations with Col. Fox and Commissioner Middleton, Mr. Ostrander, as attorney for the Santa Clara Lumber Company and George R. Finch, had insisted that they were the owners of these lands and that the state was not the owner. Mr. Ostrander urged the commissioner and Col. Fox to bring a suit to determine the title. The defendants could not bring action against the state under the cir-

cumstances; and, if the title were to be determined in court, it must be in an action instituted upon behalf of the state. Col. Fox was connected with the department of state, having charge of the forests, and at one time holding the position of superintendent of forests. Commissioner Middleton relied upon his advice in matters of land titles and values. At length, but before action had been brought, it was suggested to the defendants to make a settlement of their various claims. Mr. Ostrander consulted with his clients, and later came to an agreement or settlement with the commissioner through Col. Fox, in compliance with which the summons, complaint, and answers were served, the stipulation for judgment was entered into by the attorneys for the plaintiff and the defendants, the deed from the defendants to the state was executed and Mr. Ostrander and Jotham P. Allds, Esq., attorney for the state in said action, went to Johnstown and procured from Judge Henry T. Kellogg an order for the entry of judgment. Upon the signing of the order, the deed was handed to Mr. Allds, to be held by him as a delivery to be effective upon the entry of the judgment in accordance with the order. To procure this deed Mr. Allds said was the reason, if not the chief reason, why he had gone to Johnstown. The Litchfield Case, so-called, had been tried before Henry T. Kellogg as referee; and at the time the application for the order to Mr. Justice Henry T. Kellogg was made he was informed that the lands in question were in the neighborhood of those lands, the title of which he had passed upon in the Litchfield Case. Judge Kellogg, while he had little recollection of the matter, says he cannot contradict any statements made by Allds and Ostrander. After the decision in the Litchfield Case, a motion was made before Mr. Justice Spencer, whose opinion, delivered in deciding this motion, is founded in 43 Misc. Rep. 411, 89 N. Y. Supp. 338. The lands there in question were in the south part of, or just south of, township 25 of McComb's Purchase, and the last paragraph of the opinion of Judge Spencer is this:

"If the referee was right in his holding that the plaintiff was limited by the survey made by Wright, and the lines run by him, it is of no consequence what a prior survey made by the state may disclose as indicating the true south line of great lot No. 1, for the simple reason that the plaintiff by his purchase acquired title only to the lands actually surveyed and laid out by Wright. If such survey was erroneous and the south line of township No. 25 was not made to correspond to the south line of great lot No. 1, the intervening territory would remain in the then owners as tenants in common, and not pass under the deed of partition. I think the judgment in this case must stand or fall upon the correctness of the decision of the learned referee in that regard. If the conveyance included the entire lot, and the grantees took title to its boundaries, the Brodhead map may be of the utmost importance; otherwise it has little or none."

Mr. Allds was a witness in this case, and testified that he had represented as attorney the interests of the state in the Litchfield Case; that, although the state was not a party, it felt that it was for its interests that the defendants should succeed in the Litchfield Case. The state felt very hopeful that the decision in that case would control as to the so-called gore north of townships 47 and 50 of Totten & Crossfield's Purchase. But with this holding of Judge Spencer, in-

timating that, if the grantees of lots 25 and 26 were limited to the line surveyed by Wright, while the patent in fact went to the line surveyed by Brodhead, the title to the gore rested in the tenants in common (those who had succeeded to the title of McComb's Purchase), Mr Allds says that the state considered the title to be in so great uncertainty that it was thought best to make the settlement. It is urged by the plaintiff that Mr. Ostrander was an expert in the matter of land titles in the Adirondacks, and undoubtedly he has been for years very familiar with them. But the land titles in the neighborhood of the Brodhead line and the Campbell, Mitchell, and Wright line had been much exploited in the Litchfield case to the knowledge of Mr Allds, who attended all of the hearings except one. We cannot presume that Col. Fox, as familiar as· he was with land titles in the Adirondacks, did not know the condition of the documentary and record evidence as to the land title to this gore in question. I am unable to discover anything in the evidence in this case which justifies me in holding that there was any fraud or collusion upon the part of Mr. Ostrander or of any one of the defendants which induced this settlement with the state. It was a voluntary settlement, made by the commissioner, through Col. Fox, who was thoroughly familiar with all the matters connected with the title, and with Allds as attorney, who had just made a close study of the Litchfield case; and the state documents used in the Litchfield Case showed many of the facts with reference to the title to this gore. Nor is there any evidence in the case to indicate that there was any collusion between Col. Fox and Mr. Ostrander by which this judgment of 1904 was brought about.

[2] If, therefore, the stipulation, order, and judgment may be vacated and set aside, it is because there was no authority in the Forest, Fish, and Game Commissioner and his attorney to make the settlement which culminated in the judgment of November, 1904, and the conveyances in accordance therewith. If there was authority to settle the action, it was contained in section 20 of chapter 220 of the Laws of 1897, as amended by section 1, c. 135, of the Laws of 1898. It is not disputed by the plaintiff that this statute in words covers the said action brought by the people of the state of New York against the Santa Clara Lumber Company, George R. Finch, and George N. Ostrander in 1904; but the plaintiff claims that this statute did not contemplate the kind of settlement made; that is, an award of title to any other than the state, and that, if it did, the statute is unconstitutional, because in conflict with article 7, § 7, of the state Constitution, as follows:

"The lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed."

The first question is whether or not the statute which authorized the settlement of such an action contemplated the kind of settlement made. In determining what the settlement was, it is necessary to take into account the agreement, the judgment, and the transfers made in pur-

suance of said agreement and judgment. One paper cannot be separated from the other; because each was a part of the contemplated transaction and of the transaction as actually made. While the judgment of the court decreed that the title to the lands was in the defendants, that decree was made under the agreement that, immediately upon its entry, not only the lands in question, but other lands to which the state made no claim, should immediately be conveyed to it. But in that conveyance the soft timber growing upon the lands in question was reserved to the grantors, the defendants in the action. The result, therefore, of the agreement and its fulfillment was that the state became possessed of the title of the land, and the grantors became possessed of the soft timber upon that land. This soft timber was standing and was real estate. Did the statute contemplate a settlement which involved such a transaction? So far as applicable to this case, the statute provides that the forest preserve board may bring an action in the name of the people of the state—

"to ascertain and determine the title to lands in the Adirondack park or in the forest preserve claimed by any person or persons, associations or corporations adversely to the state, and, if such lands are held or occupied by or under such claimants, to recover the possession thereof; and to demand an accounting and recover damages for any timber cut or moved from any lands involved in any such action, and for such purposes may bring any action or special proceeding which an owner of lands would be entitled to bring. The forest preserve board may make any demand, tender or offer, before or after commencing any action or special proceeding, deemed necessary or proper for the purpose of entitling it to enforce or defend any right or claim on behalf of the state, and may, in their discretion, settle and compromise any suits and special proceedings authorized by this section and adjust the claims involved therein. The forest preserve board may employ attorneys and counsel to prosecute any such action or special proceeding or any action or proceeding brought against the board or any of its members arising out of their official conduct with relation to the forest preserve."

We have, therefore, the authority in the forest preserve board to bring the said action which was brought in 1904, which was an action to ascertain and determine the title to lands in the Adirondack park claimed by the defendants adversely to the state and to recover possession of those lands, the defendant Santa Clara Lumber Company being in occupation thereof. The same statute which authorizes the bringing of that action authorizes the said board to settle and compromise the suit. The suit involving the title to land, the authority to settle certainly contemplated that the settlement might fix the title to the land; and if, in the discretion of the board, it was thought wise, it contemplated that a part of the land might be awarded to one party to the action and another part to another party to the action. I conclude, therefore, that the authority to settle the action gave authority to make the kind of settlement made in this case. It could not have contemplated anything less.

[3] The remaining question in the case is presented under the Constitution (article 7, § 7), above quoted. The state maintains here that the said statute under which said settlement was made and judgment entered violates this provision. Before it can be held that the Constitution forbids the sale of lands, it must appear that the lands did in fact belong to the state. The prohibition runs against selling, etc., the

"lands of the state, constituting the forest preserve," and timber thereon. That lands are situated within the general limits of the Adirondack park does not make those lands a part of the forest preserve unless they belong to the state. Within those general limits, much land is owned by individuals or corporations. The Constitution does not forbid the sale and transfer of such lands. When this settlement was entered into, the title to this land was not determined. It was in dispute. The state then made its settlement and judgment was entered thereon.

Now the state maintains that, regardless of said judgment of this court, the court should in this action try the title; and, if it finds that the state, did in fact own the lands, it should set aside the aforesaid judgment, etc., because the Constitution was violated. But said judgment of 1904 awards the title to others than the state. Can the state then disregard that judgment for the time being, try the title, and then, because it finds the title in the state, rather than the defendants, set aside the judgment? As between individuals, this could not be done under the circumstances. The parties would be bound by the stipulation, agreement, and judgment. Is the state bound? The state is not bound by the unauthorized acts of its agents or officials. Wells v. Johnston, 171 N. Y. 324, 63 N. E. 1095. It is bound by the authorized acts of its agents, and it must be bound by the final judgments of the courts in actions to which it is a party. Otherwise there could be no final result of such actions, except when the state has been successful to the fullest extent possible. In this case the court holds that there was no fraud or deception practiced upon any representative of the state in connection with the agreement, stipulation or judgment, nor is there collusion connected therewith. There was an honest dispute as to the title. The transaction was between men equally conversant with the title, the decision bearing thereon and the difficulties and uncertainties connected therewith, and it was made in good faith on both sides before there was any adjudication as to the title.

[4] In my opinion the reasoning, on facts presenting a parallel question in United States v. Realty Co., 163 U. S. 437, 16 Sup. Ct. 1124, 41 L. Ed. 215, is applicable here:

"We regard the question of the unconstitutionality of the bounty provisions of the act of 1890 as entirely immaterial to the discussion here. These parties did not at that time (when manufacturing under its provisions) know that the act was unconstitutional. They could not be regarded as failing to do their whole duty because they proceeded with the manufacture of sugar in reliance upon the bounty promised by the government, under an act recognized by the officers of the government as valid, and which they were at all times executing. But it is said that, if the law be unconstitutional, the law imputes to these parties at all times a knowledge of its invalidity, and that it is not rendered valid by acquiescence in its provisions for any length of time even by officers of the government holding the highest places therein and who are charged with its execution and believe in its validity. Being unconstitutional, there never was a moment, it is stated, when there was any valid act, and therefore no equities can arise in their favor because of any acts done by them upon the faith of the act, which they were bound to know was wholly void. This reasoning does not exactly fit the case. It is not a question whether any strictly legal rights can arise out of an unconstitutional act. It is a question whether equitable considerations can attach to a claim which, among other grounds, is based upon an act that was supposed by all the offi-

cers of the government to be valid and which was repealed only when the whole taxing act of 1890 was subjected to a careful and comprehensive revision. There are occasions when the presumption that every man knows the law must be enforced for the safety of society itself. An individual on trial for a violation of the criminal law will not be heard to allege as a defense that he did not know the act of which he was guilty was criminal. But in such a case as this knowledge of the invalidity of the law in advance of any authoritative declaration to that effect will not be imputed to those who are acting under its provisions, and receiving the benefits provided by its terms. These parties cannot be held bound, upon the question of equitable or moral consideration, to know what no one else actually knew, and what no one could know prior to the determination, by some judicial tribunal, that the law was unconstitutional. Although it should finally turn out that the law is invalid, and is so pronounced, yet during all the time of its operation, as has been stated, all the officers of the government united in treating it as a valid act. No court had determined to the contrary. It was a question at least admitting of argument. Under such circumstances, can it be said that the plaintiffs in these suits and persons situated like them were bound to know that this law was and would be pronounced unconstitutional, and that no rights could be acquired under it, and that they would not be justified in proceeding to manufacture sugar according to its provisions? Could no equities be built up in their behalf (which the government might subsequently recognize) founded upon the belief that the act was valid, and upon the action of the officers of the government under it, because it was, or subsequently might be pronounced to be, unconstitutional?"

The defendants had the right to act as they did upon the honest belief that the act of the Legislature was valid. So acting, they conveyed to the state lands to 1,400 acres of which the state made and had no claim. They presumably have cut timber thereon and removed it therefrom (seven years have elapsed since the judgment and they had but eight in which to secure the soft timber), thus placing themselves in a serious position under our laws, if the lands in question were state lands. Under such circumstances, the state cannot be allowed, seven years after the transaction, to repudiate the settlement made. The case, presents every element of equitable estoppel against the state. The state is bound by the settlement and judgment and is not in a position to have here a determination as to the title of the lands and as to the constitutionality of the statute. People v. Ostrander, 144 App. Div. 860, and cases cited on page 862, 129 N. Y. Supp. 922. In 8 Cyc. 793, it is said:

"The doctrine of waiver and equitable estoppel applies to acts of the government the same as in other cases."

The statute under which the settlement was made has been in force since 1897. Settlements similar to that made in the action of 1904 have been made between the state and individuals; and, if the state may now come into court, and, in the face of its settlement, claim that it did in fact own the lands concerning which the settlement was made, and that, therefore, the settlement was unauthorized under the Constitution, the state would be doing a great injustice and would be placing citizens who had dealt with it in good faith in an unfair and prejudiced position. In each such case, the citizen is bound by the settlement. So, if the state may bring the citizen into court, after the settlement is made, and then try the title, the position is this: If the state shall succeed in establishing its title, then the settlement is invalid under the

Constitution and the citizen loses whatever benefit he got from that settlement. If the state fails to establish its title to the lands, in question, then the settlement is binding upon both the state and the citizen, and the citizen loses the benefit of the finding as to title. In either event, the citizen suffers.

The plaintiff has strongly urged that the fact that the settlement was first made, and then the suit was brought to carry out the settlement, was an unwarranted use of the court, and in itself indicative of fraud and conspiracy. But the bringing of the action is not the vital element in the matter. The vital element is whether or not there was an honest dispute as to the title, and were the defendants justified by the then condition of the title in claiming to own the lands? If an honest dispute existed, the settlement could be agreed upon as well before a summons was served as after. That the action was brought and the judgment procured in pursuance of the agreement honestly made, because through an action only could the settlement be accomplished under the statute, does not impress me as stamping the proceeding with fraud. Plainly the dispute arose before a summons was served. Both parties knew the condition of the title and of the land and timber. Both parties claimed title and the defendants had cut timber. It would require the judgment of the court before either party could know in whom the title rested. The statute furnished the only authority for settling that kind of a dispute, and fraud will not be inferred because the provisions of the statute were complied with by bringing an action after the terms of settlement had been agreed upon. The good faith of the parties, not the point of time in the dealings when the summons was served, determines whether or not there was fraud or collusion.

The defendants are entitled to a dismissal of the complaint, with costs.

Judgment accordingly.