BLANCHE PAIGE, an Infant, by MARY VENTON, Her Guardian ad Litem, Appellant, Respondent, *v.* THE STATE OF NEW YORK, Respondent, Appellant. (Claim No. 23310.)

Third Department, June 27, 1935.

*Sidney L. Grossman* [*Rollin B. Sanford* of counsel], for the plaintiff.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor General,* and *Leon M. Layden, Assistant Attorney-General,* of counsel], for the defendant.

McNAMEE, J. Pursuant to a conviction and sentence by a Police Court, the claimant, at the age of twenty, was confined as a prisoner in a reformatory owned and conducted by a private corporation. On November 10, 1932, the day following her incarceration under the sentence, she was set at work in the ironing room to iron by hand. Later in the same day she was directed by the person in charge to work on a power press or ironing machine. She continued to operate this machine until her hand and arm were caught in the machine, and she suffered severe injuries.

The machine in question was driven by electric power, and its ironing surface was heated by steam. The bed, or " buck," of the

machine was padded and stationary, and its function was similar to that of the common ironing board; while the head, so called, over the buck, was made of heavy, hollow metal, so as to receive hot steam, and its lower face was a heated, plain, polished surface. When not in use the head was elevated above the bed an ample distance to permit the adjustment of fabrics upon the buck. The head was attached to the frame of the machine by a hinge-like lever, so that when operated it descended on and came into contact with the fabric adjusted on the buck with a pressing motion, and the fabric was smoothed by the pressing of the heated and polished surface of the head. The head was not designed nor intended to begin its course downward until the power was applied thereto by the operator. The machine consists of many parts, both moving and stationary, including an electric motor, and many levers, switches and other attachments for the application of electric power, for the induction and exhaust of steam, for starting, stopping and adjusting in the usual course, and also for use in case of emergency. One of the attachments of this machine was an emergency foot lever located near the floor and in front of the machine within quick and easy reach of the foot of the operator. This lever was designed to stop the machine and to release the head instantly, in the event that any of the mechanism failed to operate properly.

On the second day of claimant's term she was directed by the person in charge of the ironing room to stand by the machine in question, and to watch another inmate who was operating it. This inmate told claimant the purpose of different parts of the machine, how they were operated, how to oil them, and how to turn the steam on and off. This observation and these instructions continued for about two hours. Thereupon the claimant was set to operating the machine, although she had no previous experience with a similar machine; and she received no added instructions, except that she was told by the person in charge never to touch the emergency lever. The claimant did not know the purpose of the emergency lever, nor how to use it. The State's expert testified that it was the common practice of skilled demonstrators to spend a day or two in teaching the use of the machine in question to the average operator.

On January 20, 1933, while the claimant was operating this machine in the usual manner, while the head was elevated and not in operation, and while her hand and arm were over the buck, the head suddenly and heavily fell upon claimant's hand and arm, and held them between the buck and the heated head. Although there were twenty persons in the room, including the one in charge, there was no one there of sufficient understanding of the machine

to release the claimant, and it was necessary to send for the boiler-man, who was two stories below in the basement. After a period, between five and ten minutes, the boilerman arrived and touched the emergency lever with his foot, and immediately the head of the machine sprung up and the claimant was released. Claimant's hand and arm were burned in the third degree; and after extended efforts by the surgeons for a month to avoid amputation, the hand and half of the forearm were removed.

No one appeared to know the cause of the falling of the head; but it was the opinion of an engineer of broad experience in laundry machinery that the head could not fall, as it did in this case, if the magnetic brake control was in order, and that the brake mechanism was out of order. The reasonable inference to be drawn from all of the evidence is that there was no one connected with the laundry department who was competent to determine the condition of the machine, or to repair it, or even to instruct an operator. From the testimony of the witness Foster, Assistant Commissioner of the State Department of Social Welfare, it appears that it was the duty of the Department of Welfare to make inspection of the institution in question; that its inspectors are without special training in mechanics; that inspections are not made periodically; and that no inspection of any character of the place in question had been made by the Department of Welfare between June 7, 1931, and January 20, 1933.

The courts of criminal jurisdiction of this State, outside of the counties of New York and Kings, are authorized to commit females to the reformatory in question for terms extending from six months to three years, depending upon the age of the one committed; and the institution is authorized to receive and to hold such females as prisoners (Laws of 1902, chap. 603). The claimant here was committed under that statute, and for one of the offenses therein mentioned.

Section 20 of the State Charities Law provides for the " visitation, inspection and supervision " of all private institutions of a cor-rectional character, as well as most public institutions, " at any and all times," with full access to the grounds and buildings, and the officers and employees of such institutions are thereby obligated to furnish the information required for the performance of these duties. Section 17 of the same act makes it the duty of the Depart-ment to advise the officers of such institutions in the performance of their duties, and as to the best measures for the care of such inmates; to investigate the management and conduct of such institutions, and the efficiency of the persons charged with the care of inmates; and to " advise measures for the protection and

preservation of the health of the inmates and beneficiaries." By section 12-a of the Court of Claims Act the State waives its immunity from liability for the torts of its officers and employees, and assumes liability for personal injuries caused " by the misfeasance or negligence of the officers or employees of the state while acting as such officer or employee."

Under the statutes above mentioned the State assumed to imprison the claimant for her misconduct, and delegated to the reformatory in question the duty of carrying out its sentence. In doing that it became its clear duty to protect the claimant against injury due to the negligence of those acting in behalf of the State. The record here indicates that the machine in question was a dangerous machine, either in its nature or its condition of repair; that the claimant was not reasonably instructed in the use of this machine; that there was no one in charge of the department in which she was employed who was competent to protect her against injury when the emergency arose, although the record establishes that she would have been injured slightly or not at all, if she herself knew how to make use of the emergency device, or if there had been any one in the room who knew how to do it. The Division of Child Welfare was charged by assignment and the express terms of the statute with the duty of making reasonable investigation, and exercising reasonable supervision; yet no one of that division had visited the institution where claimant was injured for nearly a year and a half, and concededly its inspectors had no training in mechanics, and were not competent to make the proper inspection.

It may not be said that the State can escape liability under the statutes referred to, when inexperienced and irresponsible girls, under its authority, may be placed in restraint for safe-keeping in institutions under the control and supervision of the State, when there is a substantial disregard of the duty of inspection and supervision which the statute requires, and personal injury results from such nonfeasance. The record here fully justified the Court of Claims in finding negligence on the part of the State officials.

On the question of damages it is not necessary to review in detail the nature and extent of the injuries inflicted upon the claimant; they are evident from a mere statement of the facts above mentioned. Aside from the physical suffering that was endured, and the loss of substantial parts of the body, the claimant will be subject throughout her life to a never-ending succession of humiliations due to her maimed condition; she has been seriously limited in the prospect of marriage and the support a husband would provide, as well as the ambition natural to her sex for a home

and family; she has been deprived of the protection against physical accident and injury which the lost members would insure; she has been deprived of a substantial degree of self-help, and has become permanently dependent upon others for many attentions and services in caring for her person. In the judgment of the court, the award of the Court of Claims was inadequate as compensation in these circumstances. The award should be modified by increasing the damages from the sum of $4,000 to the sum of $12,000; and, accordingly modified, the judgment should be affirmed, with costs.

HILL, P. J., RHODES and HEFFERNAN, JJ., concur.

BLISS, J. I concur in the opinion in all respects except as to the amount of damages. While the original award of $4,000 was inadequate, the proposed award of $12,000 is excessive. I am forced, therefore, to dissent from that portion of the decision which increases the amount of the damages awarded to $12,000.

Judgment modified in accordance with opinion, and as so modified affirmed, with costs.

The amount of damages suffered by the claimant as found by the Court of Claims in the twenty-first finding of fact and the sixth conclusion of law is disapproved. The court makes a new finding that the claimant suffered damages in the sum of $12,000; and the finding of fact of the court below is modified by striking out the amount $4,000 and inserting in the place thereof the amount $12,000.