FRANCIS LEE, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 27859.)

Court of Claims, August 15, 1946.

*Theodore Berger* (deceased) and *Jacob W. Friedman* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Ward N. Truesdell* of counsel), for defendant.

LAMBIASE, J. On August 13, 1941, claimant was an inmate of the Wassaic State School having been duly committed to that State institution as an indigent mental defective by an order dated April 24, 1934, of Mr. Justice FRANKENTHALER, Justice of the Supreme Court of the State of New York, and having been duly admitted to the said school in June, 1934. Wassaic State School now is and at all times hereinafter mentioned was a State school for the care and treatment of the poor and indigent mental defectives of the State of New York.

In his claim herein, claimant alleges among other things:

That on August 13, 1941, at said school aforesaid, he was operating a machine described as a " hair picker ", which machine was used to rework and to renovate old, matted hair taken from pillows, mattresses, and hair-stuffed furniture; that while thus engaged, and because of the negligence of the State in failing to provide a proper safeguard in connection with said machine, and in failing to properly supervise the operation of such machine by himself as an inmate of the school, he sustained an injury to his right hand necessitating the amputation of part of the palm and of all of the fingers thereof except the thumb; and that at the time of the alleged accident and its resultant injury to him, he was under a legal disability in that he was an incompetent person by reason of mental defectiveness. Claimant seeks by this action to collect damages for his injuries.

Claimant was detained in said school pursuant to said order of commitment until May 9, 1943, at which time he was duly paroled to the custody of a brother. He was finally discharged from the school as improved, and as able to manage himself and his own affairs needing no further institutional care and control on November 16, 1943.

No notice of intention to file a claim has ever been filed herein, except one which was filed in March, 1944, and which claimant later and on May 1, 1944, withdrew. The claim itself was filed December 2, 1944. Previous to the filing thereof, claimant made application to this court under subdivision 5 of section 10 of the Court of Claims Act (L. 1939, ch. 860) for an order permitting him to file. Subdivision 5 of the Court of Claims Act provides as follows: " A claimant who fails to file a claim or notice of intention, as provided in the foregoing subdivisions, within the time limited therein for filing the notice of intention, may, nevertheless, in the discretion of the court, be permitted to file such claim at any time within two years after the accrual thereof, or in the case of a claim for wrongful death, within two years after the decedent's death. * * * But if the claimant shall be under legal disability, the claim may be presented within two years after such disability is removed." Claimant's application, though originally made upon other grounds provided for in subdivision 5 aforesaid, was submitted finally, solely under that part of said subdivision 5 which reads: " But if the claimant shall be under legal disability, the claim may be presented within two years after such disability is removed." It was conceded previous to the submission of the motion to the court that no other part of subdivision 5 aforesaid was pertinent to the application. Upon the aforesaid applica-

tion which was made returnable before this court April 14, 1944, and upon the subsequent trial of the claim herein, claimant contended: (1) That until his parole in May, 1943, or until his discharge from the school on November 16, 1943, he was under a legal disability within the meaning of said subdivision 5 of section 10 of the Court of Claims Act by reason of incompetency resulting from mental defectiveness; and that because of the foregoing he was entitled to an order permitting him to file his claim since his application had been made within two years after the removal of his legal disability; and (2) that the State was equitably estopped from pleading limitations of any kind.

The State, in opposing claimant's application afore-mentioned and upon the subsequent trial of the claim herein, contended that it had not been proved that claimant was insane or incompetent, and that consequently it had not been established that claimant was under a legal disability within the meaning of the law at the time of the accrual of his alleged claim. It asserted that section 60 of the Civil Practice Act was applicable to the instant claim, and maintained that a mental defective did not come within the provisions of section 60 aforesaid.

Section 60 aforesaid enumerates therein certain legal disabilities, the time of the duration of which under the limitations in said section set forth, is excluded when computing the time within which an action must be commenced. An examination of that section discloses that the term " mental defective " or " mental defectiveness " is not mentioned therein.

On November 22, 1944, Presiding Judge JAMES J. BARRETT of this court made an order on claimant's afore-mentioned application which order provides: " that the above named Francis Lee, be and he hereby is permitted to file his said claim within twenty (20) days from the date of the entry of this order; and it is further

" ORDERED, that upon the trial, the STATE may offer competent proof that said FRANCIS LEE was not under a legal disability within the meaning of Section 10 (5) of the Court of Claims Act on and after the 13th day of August, 1941, the date upon which the accident herein happened, it being the intention of the Court to reserve final decision of the question of legal disability until all admissible proof thereon has been submitted." Thus the right to file a claim herein was given to claimant conditionally by Judge BARRETT's order, and there was reserved as a trial issue the final determination of the question

of claimant's alleged legal disability at the time of the accrual of his alleged claim.

Thereafter the claim herein was duly brought on for trial before us. We must now make disposition of it. It would seem, therefore, that in the orderly consideration of the questions involved in the disposition of this claim, we must first dispose of the question of claimant's alleged legal disability, for if claimant has not been established to have been under a legal disability at the time his alleged claim accrued, the filing of the claim herein was not timely (Court of Claims Act, § 10, subd. 3); the order of Judge BARRETT in its conditional form does not aid the claimant; and this court, under the circumstances, has not the jurisdiction to entertain claimant's claim. We would, therefore, be compelled to dismiss it. On the other hand, if it has been established that the claimant was, indeed, under a legal disability at the time of the filing of his alleged claim, the filing of his alleged claim herein was timely and proper, and we would then pass upon the claim upon its merits.

The question of claimant's legal disability involves the consideration and construction of subdivision 5 of section 10 of the Court of Claims Act, hereinbefore quoted, and particularly that part thereof under which claimant made and submitted his application for the order granting him permission to file the claim herein. It is important to note that said subdivision 5 does not define the term "legal disability". While section 19 of article III of the Constitution of the State of New York contains a provision in the identical language of the afore-mentioned last sentence of subdivision 5 of section 10 of the Court of Claims Act, no definition of the term "legal disability" as employed therein is contained in said constitutional provision. Therefore, since said subdivision 5 of section 10 of the Court of Claims Act and since the constitutional provision hereinbefore mentioned do not define the term "legal disability" as employed therein, we must go to the law as it exists outside of these provisions to determine the legal definition of said term.

We do not agree with the State that section 60 of the Civil Practice Act, urged so vigorously by it as being determinative of the issue herein of claimant's legal disability, is decisive of or pertinent to that question. Section 60 aforesaid is entitled "Certain disabilities excluded from time to commence action", and those "Certain disabilities" are enumerated therein. Obviously the section deals with the disabilities therein enumerated and with their effect upon Statutes of Limitation. It is now well established, however, that the statutory requirement

with reference to the filing of a claim against a municipality previous to the commencement of an action against the same is a condition precedent to the maintenance of such action (*Biggs* v. *City of Geneva,* 184 N. Y. 580, 581; *Jones* v. *City of Albany,* 151 N. Y. 223, 226; *Curry* v. *City of Buffalo,* 135 N. Y. 366, 370) and it has been held that there is no distinction between the notice referred to in the above-cited cases and the notice of intention to file a claim required by the Court of Claims Act. (*Baronness* v. *State of New York,* 153 Misc. 212; *Federman* v. *State of New York,* 173 Misc. 830.)   In the instant case, therefore, we are concerned with the matter of a condition precedent, and not with the matter of a Statute of Limitations.

Section 236 of the Civil Practice Act now reads and at all times herein mentioned read in pertinent part as follows: " A party who is of full age may prosecute or defend a civil action in person or by attorney unless he has been judicially declared to be incompetent to manage his affairs."   The words " judicially declared  *  *  *  incompetent " have reference to proceedings under the Civil Practice Act for the appointment of a committee to take possession of and care for the property of an incompetent.   (*Finch* v. *Goldstein,* 245 N. Y. 300, 303.)

*Matter of Palestine* (151 Misc. 100, 103–104) holds:   " Section 2320 of the Code of Civil Procedure, which is now partially contained in rule 285 of the Rules of Civil Practice, drew a clear distinction between ' an alleged incompetent person ' and ' an incompetent person,' the latter being one who has been judicially determined to be mentally unfit.   It is only in respect to the latter that the disabilities respecting management of property, etc., envisaged in article 81 of the Civil Practice Act apply.   Up to the time of such judicial determination any person is presumed to be sane with the burden of a contrary demonstration resting upon him who alleges incompetency.   (*Weed* v. *Mutual Benefit Life Ins. Co.,* 70 N. Y. 561, 563; *Matter of Langdon,* 173 App. Div. 737, 738; *Ean* v. *Snyder,* 46 Barb. 230, 232.)

" In conformity with this rule it has been uniformly determined that a person of unsound mind but not judicially declared incompetent may sue (*Williams* v. *Empire Woolen Co.,* 7 App. Div. 345, 348; *Runberg* v. *Johnson,* 11 N. Y. Civ. Pro. Rep. 283, 292) and be sued (*Prentiss* v. *Cornell,* 31 Hun 167, 168; affd. 96 N. Y. 665; *Sanford* v. *Sanford,* 62 id. 553, 557; *Kent* v. *West,* 16 App. Div. 496, 499; affd. 154 N. Y. 749) in the same manner as any ordinary member of the community, with the proviso noted in *Wurster* v. *Armfield,* (175 N. Y. 256, 262), that ' Incompetent persons become the wards of the court, upon which a duty

devolves of protection both as to their persons and property. This duty is not limited to cases only in which a committee has been appointed, but it extends to all cases where the fact of incompetency exists.' '' (*Jacobs* v. *State of New York*, 175 Misc. 561.)

Section 1356 of the Civil Practice Act now reads and at all times herein involved read in pertinent part as follows: '' The jurisdiction of the supreme court extends to the custody of the person and the care of the property of a person incompetent to manage himself or his affairs in consequence of lunacy, idiocy, habitual drunkenness, or imbecility arising from old age or loss of memory and understanding, or other cause.''

Subdivision 3 of section 2 of article 1 of the Mental Hygiene Law, in effect at the time of the commitment of claimant herein and up through April 6, 1944, read as follows: '' ' Mental defective ' means any person afflicted with mental defectiveness from birth or from any early age to such an extent that he is incapable of managing himself and his affairs, who for his own welfare or the welfare of others or of the community requires supervision, control or care and who is not insane or of unsound mind to such an extent as to require his commitment to an institution for the insane as provided by this chapter * * *.'' This subdivision now reads the same except that an amendment (L. 1944, ch. 666, § 2, eff. April 7, 1944) renumbered this subdivision as number 5; and the Laws of 1944 substituted '' mentally ill '' for '' insane '', and '' certification '' for '' commitment '' wherever appearing; and except that effective July 1, 1946, said section was again renumbered, and this subdivision was renumbered 9.

The language of section 1356 of the Civil Practice Act and that of subdivision 5 of section 2 of the Mental Hygiene Law (formerly subd. 3) both hereinbefore quoted, set up the same standard for adjudication in each case, that is, incompetency or incapacity of managing one's self and one's affairs.

In *People ex rel. Beldstein* v. *Thayer* (121 Misc. 745, 746) the court says: '' In 1919 the Legislature first recognized the mental condition known as mental defectiveness. Laws of 1919, chap. 633. This is a condition of mind which is a departure from the general normal, but which is not a diseased condition, or insanity.'' And in *People ex rel. Cirrone* v. *Hoffmann* (255 App. Div. 404, 406) it is stated: '' The statutes do not define ' mental defect,' ' mental defective,' nor ' mental deficiency;' but Webster's Dictionary (1935 ed.) denominates these as

'marked subnormal intelligence,' ' lack of intelligence,' and that in varying degrees of the descending scale of moronity, imbecility, and idiocy.'' The terms '' lunatic '' and '' lunacy '' are defined by section 28 of the General Construction Law as including every kind of unsoundness of mind except idiocy.

While claimant herein has never been adjudicated incompetent and no committee of his person or of his property has ever been appointed in any proceeding under section 1356 and other pertinent sections of article 81 of the Civil Practice Act, the order of commitment herein made by Justice FRANKEN-THALER was a '' judicial determination '' of claimant's defectiveness as of the time it was made and constituted him thereby a ward of the State of New York. (*Sporza* v. *German Savings Bank,* 192 N. Y. 8, 20.)

The petition praying for the commitment of the claimant herein as a mental defective was made by an officer of the City of New York who was presumably acting within the scope of his authority. The certificate of the qualified examiners attached to° and constituting **a** part of the moving papers upon which the order of commitment was made, sets out the following under the caption of '' Mental condition '': '' Patient is dull and obedient, quiet and well behaved. Attentive, cooperative, feeds and dresses himself. Mental age — Composite Rating 8 yrs. 7 mos. I.Q. 62. Diag. Moron ''; and the order of commitment recites that: '' it is therefore hereby ORDERED, That the said Francis Lee be and hereby is adjudged mentally defective and that he be committed to Wassaic State School, Wassaic, N. Y. an institution for the custody and treatment of the mentally defective.''

A moron is defined in *People* v. *Joyce* (233 N. Y. 61, 70–71) as '' one whose intellectual development proceeds normally up to about the eighth year of age, then arrested, never exceeds that of a normal child of about twelve years ''.

It is quite true that since there was no adjudication of claimant's incompetency and no appointment of a committee of his person or of his property under the pertinent provisions of the Civil Practice Act, the legal presumption of his competency still continued; and that a person dealing with him in good faith without knowledge of his incompetency would be protected by a court of equity, insofar as he had been induced to part with money or property. (*Mutual Life Ins. Co.* v. *Hunt,* 79 N. Y. 541.) The burden of a contrary demonstration to overcome this legal presumption of competency rests with claimant, and

pertinent evidence to establish that fact is admissible. . (*Wurster* v. *Armfield,* 175 N. Y. 256, 261; *Matter of Palestine,* 151 Misc. 100, *supra.*) We are satisfied that claimant has met and sustained this " burden of a contrary demonstration ". It would serve but to unnecessarily prolong this opinion if we were to discuss this point at great length. .

However, on the question. of claimant's mental condition during the time of his detention at the school, we are impressed with the fact that the school and its officials did not release claimant from its custody until May 9, 1943, and then only on parole to the custody of his brother James; that it was considered at the time of claimant's parole that he was not then capable of managing himself and his affairs; and that it was not until November 16, 1943, after claimant had demonstrated his ability to get along and to procure and retain gainful employment that the school and its officials concluded that claimant's mental condition had " improved " to the point that he was able to manage himself and his own affairs, and no longer needed the care and control of the institution, and, therefore, finally discharged him. We are satisfied that the school and its officials had no motive for his detention other than that which was necessary for his benefit in caring for and protecting him, and if possible, to cure him of his mental condition.

We conclude, therefore, that claimant herein was under a legal disability within the meaning of the law and particularly within the meaning of subdivision 5 of section 10 of the Court of Claims Act at the time of the accrual of his alleged claim in that he was at said time and up to the time of his final discharge from the school incompetent to manage himself and his affairs arising from loss or lack of understanding in consequence of his condition of mental defectiveness. (*Matter of Brugh,* 61 Hun 193.) In *Weber* v. *State of New York* (267 App. Div. 325, 327, affg. 181 Misc. 44) the court says: " Infancy, along with incompetency, habitual drunkenness, and the like, are legal disabilities." We hold, therefore, that the claim herein has been properly and timely filed.

We could at this point, in view of the foregoing, terminate our discussion of the question of claimant's legal disability. However, claimant has urged another point, namely, that the State is estopped from pleading limitations of any kind with reference to the filing of claimant's claim herein, in his brief to sustain his position with reference to the question of his alleged legal disability, which point we feel merits our attention, and we shall, therefore, discuss it.

As hereinbefore noted, the petition initiating the proceedings herein was made by an officer of the City of New York on a form provided by the State of New York, Department of Mental Hygiene, which form is entitled "State of New York, Department of Mental Hygiene, Division of Mental Defectives and Epilepsy". The order of commitment herein was duly made by a Justice of the Supreme Court of the State of New York. The State, acting through its superintendent or director at Wassaic State School, detained the claimant at said school by virtue of said order of commitment until it had been duly determined that claimant was capable of managing himself and his affairs, and, therefore, could be and was discharged. Upon the authority of the order of commitment, the State accepted claimant as a mental defective, as said term is defined by statute, and it was, therefore, charged with the responsibility of claimant's custody, care, and treatment. (Mental Hygiene Law, §§ 10, 120.)

Section 124 of the Mental Hygiene Law (subd. 8) provides in pertinent part: "The director or person in charge of any institution for the care and treatment of the mentally defective may refuse to receive any person upon any such order, if the papers required to be presented shall not comply with the provisions of this section, or if in his judgment, such person is not mentally defective within the meaning of this statute, or if received, such person may be discharged by the director or person in charge."

The word "order" in the foregoing section refers to the order of commitment. The foregoing section, therefore, specifically authorizes the "director or person in charge" to refuse to receive any person for the reasons in said section stated, and it authorizes further that if any person be received, "such person may be discharged by the director or person in charge." The acceptance of the claimant by the State as a mental defective within the statutory definition of said term, the State's detention of the claimant as such a mental defective for the period of time hereinbefore stated, and the State's course of action and conduct toward the claimant in caring for and treating him while at said school constitute, in our opinion, an acknowledgment and an admission on the part of the State that the claimant was indeed, insofar as the State, at least, was concerned, a mental defective and an incompetent as defined in the statute under which he was committed. Having successfully maintained the position that claimant was a mental defective

and an incompetent within the meaning of the law, the State, in our opinion, is estopped now from assuming a position inconsistent or in conflict therewith to the prejudice of this claimant. (*Turner Constr. Co.* v. *State of New York*, 253 App. Div. 784; *Matter of Fischer* v. *Tremaine*, 164 Misc. 576; *Houghton* v. *Thomas*, 220 App. Div. 415, motion to dismiss appeal denied 246 N. Y. 535, affd. 248 N. Y. 523, motion to amend remittitur denied 248 N. Y. 591; *People ex rel. Crane* v. *Ormond*, 178 App. Div. 151, affd. 221 N. Y. 283.)

The doctrine of estoppel requires consistency of conduct only when inconsistency would work substantial injury to the other party. (*Matter of Wadhams*, 249 App. Div. 271.) That a sovereign State, under certain circumstances, like an individual may be estopped, may be admitted. (*Whitehall W. P. Co., Ltd.,* v. *Atlantic, G. & P. Co.*, 160 App. Div. 208.) It is only the unauthorized acts of the officers and agents of the State that fail to operate as an estoppel. (*People* v. *Finch, Pruyn & Co., Inc.*, 207 App. Div. 76; *People* v. *Santa Clara Lumber Co.*, 213 N. Y. 61, revg. 161 App. Div. 905, affg. 74 Misc. 596; *Wells* v. *Johnston*, 171 N. Y. 324, 328.)

An equitable estoppel ordinarily may be made available either by a plea in bar or may be used as evidence upon the trial. If relied upon as evidence only, it is no more necessary to plead it than to plead any other kind of evidence. (*Feinberg* v. *Allen*, 143 App. Div. 866, 868, affd. 208 N. Y. 215.)

We conclude, therefore, upon the grounds expressly stated herein that the State should not be allowed now to change its position so as to question the incompetency of the claimant at the time of the accrual of his alleged claim, and should be and is estopped from so doing. On this ground also, therefore, we hold that claimant has established that he was under a legal disability at the time of the accrual of his alleged claim, and that the claim of the claimant herein has been properly and timely filed.

We proceed now to a consideration of claimant's claim upon its merits. The so-called " hair-picker " machine, concededly of an unknown manufacture, had been acquired by the State as a secondhand machine about November, 1940. After its acquisition, a guard was built by the employees of the school in order to cover some of its exposed gears; and in particular, a guard in the form of a drawer was constructed and installed in a recess in the front of the machine so as to conceal two moving drums, one smooth and the other having spikes on its sur-

face. It was electrically powered, was not bolted to the floor, and vibrated and was noisy in operation. The attendants at the school learned by experiment how to operate it.

The purpose of the machine was to rework or renovate old, matted hair. The hair was fed into the machine through a feeder at the top front; and after passing over the spike-toothed drum, came out of the machine ready for use again. The evidence established: That while the machine was in operation, hair and dust escaped from it at the point where the drawer had been inserted, no matter how firmly the drawer was closed before the machine was started; that the vibration of the machine, when in operation, was such that the drawer shook with the machine, and as a result thereof the drawer opened up and came forward; that claimant prior to the time that he was permitted to operate the machine, had observed Mr. Bergen, the school attendant in charge, push in the drawer after it had thus moved forward; that there was a mask that Mr. Bergen used when he was operating the machine which mask fitted over the face and mouth, but did not enclose the eyes, and had a filter in it; that claimant was not permitted to use this mask; that there was no locking device of any kind attached to the drawer guard to keep it closed at the time of claimant's accident; that after the accident, the drawer was kept wedged in place by a piece of maple wood which was bolted to the bottom of the hopper and wedged against the top of the drawer (this particular testimony being offered and received without objection on the part of the State); that previous to August 13, 1941, the date of claimant's injury, claimant had been given some instructions by Mr. Bergen as to the manner of operating the machine, and that he had been told by Mr. Bergen how to press the hair into the hopper until the hair engaged the revolving drums; that claimant had previous to said August 13, 1941, been permitted by Mr. Bergen to operate the machine; that on said August 13, 1941, claimant and Mr. Bergen, who was in charge of the machine, were together in the room where the hair-picker machine was located, and at that time Mr. Bergen permitted claimant to operate the machine; that claimant began feeding the hair into the machine and pressing down on it as he had been instructed to do by Mr. Bergen, the hair being handed to him by Mr. Bergen; that as the machine was being thus operated, claimant noticed that the afore-mentioned drawer was moving forward and coming out; that dust was coming out from the open drawer and was settling upon him; that he informed Mr. Bergen of that fact; that there came a time when the claimant bent down

to push the drawer in; that dust and hair coming therefrom got into his eyes and his sight became blurred; that he was unable to see because of that condition, and that as he bent down to push the drawer in, his hand was mangled; that immediately after the accident, the drawer was found on the floor, and parts of claimant's fingers were found in the machine. There is no need for any further details as to how the accident occurred. There is no doubt that claimant's hand was mangled by the machine; and we are satisfied that the accident resulting in the injury described herein to the claimant happened substantially as related by claimant.

To recover herein claimant must show by a fair preponderance of the credible proof that the State, its employees and agents were negligent, and that such negligence was the sole, proximate, producing cause of the accident and of the injuries sustained by claimant by reason thereof.

The claimant contends in urging the negligence of the State that under the circumstances of this case, the State violated section 146 of the Labor Law which section, among other things, at all times herein mentioned provided and now provides as follows: " § 146. *Prohibited employment of children and females.* 1. No child under sixteen years of age shall be employed in operating or assisting in operating any of the following: * * * (m) Picker machines or machines used in picking wool, cotton, hair or upholstery material * * *." With this contention of claimant we are unable to agree. It is an ancient rule that general words in a statute neither include nor bind the government by whose authority it was enacted " ' where its sovereignty, rights, prerogatives or interests are involved.' " (*Denton* v. *State of New York,* 72 App. Div. 248, 251.) It is also a well-settled doctrine that a statute prescribing in general terms procedural requirements is not applicable to the State or its political subdivisions unless such entities are specifically included in the statute. (*Jewish Hospital of Brooklyn* v. " *John Doe* ", 252 App. Div. 581.)

As was said in *Beale* v. *State* (46 N. Y. S. 2d 824, 826): " We find no basis for invoking the statute. The Labor Law does not apply to the State in its relations to persons who are assigned to work in shops maintained and operated in connection with the several State institutions in which they may be inmates at the time. Inmates of such institutions are usually there by commitment, and for a special purpose incident to their individual condition, — never voluntarily in the capacity of servant or employee. The care and custody of such persons

and the places in which they are assigned to do work come within the meaning of the statutes pertinent to the administration of the institutions involved, and the Labor Law does not apply. Had the Legislature intended to impose the provisions of the Labor Law upon the State in the administration of its institutional shops, so that a violation thereof would give rise to a presumption of negligence, it would have said so and not left it to judicial construction.

" This does not mean, however, that an inmate of an institution injured in its shops is not without a remedy. He still has his common-law action, and this the State, by waiving immunity, makes available to him. Sec. 8, Court of Claims Act. In determining an issue of actionable negligence under such circumstances, we may, with all fairness to the State, measure its duty in respect to inmates working in its institutional shops by the same standard of care imposed by the Legislature upon its citizens engaged in similar employment in industry."

The foregoing we believe to be eminently humane and in keeping with the established social policy of the State. We thus are able to determine the issue in harmony with sound rules, without tampering with the relationship created by other statutes which authorize assignment of institutional inmates to shopwork, by substituting therefor the relationship of employee and employer within the scope of the Labor Law. (*Beale* v. *State, supra.*)

Upon claimant's commitment herein, he became a ward of the State. The State, through its officers, had undertaken his care, maintenance, and medical treatment. He also became a ward of the court which still had the power from time to time to inquire as to the continuance of his mental condition. (*Sporza* v. *German Savings Bank,* 192 N. Y. 8, 19, *supra.*)

It has been held that public or private institutions maintained for the care of those unfortunates suffering from mental or nervous defects or diseases have imposed upon them the legal duty of taking every reasonable precaution to protect their patients from injury, self-inflicted or otherwise. (*Shattuck* v. *State of New York,* 166 Misc. 271; *Van Patter* v. *Charles B. Towns Hospital,* 246 N. Y. 646; *Paige* v. *State of New York,* 245 App. Div. 126; *Curley* v. *State of New York,* 148 Misc. 336; *Wilcove* v. *State of New York,* 146 Misc. 87; *Phillips* v. *Railroad,* 211 Mo. 419; *Martindale* v. *State of New York,* 269 N. Y. 554.) It thus became the clear duty of the State to protect the claimant against injury due to the negligence of those acting in its behalf.

The record herein indicates that the " hair-picker " machine

was a dangerous machine either in its nature or in its condition of repair; that the claimant was not reasonably instructed by the State, in its use and operation (*Paige* v. *State of New York,* 245 App. Div. 126, 129) and that the State, its agents, officers, and employees failed to provide proper safeguards therefor, and to properly supervise claimant's operation of said machine. We feel that the State, in the exercise of the care required of it under the circumstances, could have reasonably anticipated the danger attendant upon the operation of the machine in its then condition. Claimant's segregation from society and his confinement to a State institution for mental defectives was the utmost limit of authority which the law gave the State over him. It could not injure his health or his body with impunity. (*Scalia* v. *State of New York,* 147 Misc. 622.) In our opinion, the State has failed to exercise, in respect to this claimant, that degree of care required of it. These factors, in our opinion, are the proximate producing cause of the accident, and the resultant injury to the claimant, and establish the negligence of the State. This failure to take every reasonable precaution to protect the claimant from injury, we hold, amounts to negligence. (*Martindale* v. *State of New York,* 269 N. Y. 554, *supra.*)

We have been unable to find any contributory negligence on the part of the claimant. We do not see how claimant could have been guilty of contributory negligence under the circumstances herein. Claimant was not a free agent and was not able to do as he pleased. His liberty of action had been temporarily taken away by the State through his commitment as a mental defective. He had no choice to do anything except as he was ordered to do, and he did not voluntarily assume any of the risks or liabilities of his occupation. We find him, therefore, free from contributory negligence under the circumstances herein.

Claimant's injury is serious and permanent. He sustained injury to the second, third, fourth and fifth fingers of his right hand so extensive in nature that the injured members, together with about three-fourths of an inch of the palm downward from the knuckles had to be amputated. The evidence indicates that the loss of use of the hand is 90–95%. Osteomyelitis developed during claimant's convalescence, and at the time of the trial there was still evidence of that complication, although it was quiescent. There was evidence also that the osteomyelitis might flare up again with serious consequences. Claimant's injury was extremely painful, and although the amputation has been effected, claimant still experiences phantom pains in the

area of the amputation in the hand, which pains the medical evidence established, are real to him even though the fingers no longer exist. These phantom pains may well be permanent, and curative surgery is inadvisable. It will serve no useful purpose, and we do not deem it necessary, to further detail herein claimant's injury.

It is evident from what we have said above that claimant, aside from the physical suffering that he has suffered and will be compelled to endure, and the loss of a substantial part of his body, will be subject throughout his life to a never-ending succession of humiliations due to his maimed condition. He has been deprived of the protection against physical accident and injury which the lost member would insure. He has been deprived of a substantial degree of self-help, and has become permanently dependent on others for many attentions and services in caring for his person. (*Paige* v. *State of New York,* 245 App. Div. 126, *supra.*) He was right-handed previous to the accident, and the arm loss because of the injury sustained, while not definable in percentage, is very great since the medical testimony was to the effect that the arm without the hand could be used only to hold a paper underneath the arm, to ward off a blow, or to press down against objects.

Under the circumstances of this case it was obviously impracticable for the claimant to furnish any proof of his earning capacity in dollars and cents previous to his injury. He had held no job or position prior thereto, except such jobs and work as were assigned to him while in the school. It does, however, appear in the record that the claimant was considered by the school authorities to be a steady, conscientious and ambitious worker while confined therein, and that he did very well there. There is evidence before us of his earning capacity since he was paroled from the school in May, 1943. The record shows that in June, 1943, claimant went to work as a clerk earning $25 per week basic pay. That he worked at this job for about a year when he obtained another as a packer of phonograph records, at which job he earned as high as $42 a week with overtime. The basic pay on this latter job was not given. At the time of the trial he was employed, although with still another employer.

Claimant maintained upon his application for permission to file a claim herein and throughout the trial of this claim, that at the time that he was paroled to his brother in May, 1943, or at least not later than in November, 1943, when he was given his final discharge from the school as improved and as able

to manage himself and his affairs with no more need for institutional control and care, he was competent, and that, of course, he was competent at the time of the trial. The testimony of Dr. Gerard Ostheimer of the school staff indicates particularly claimant's competency at the time of his final discharge.

The State has maintained throughout that the claimant was never proved to have been incompetent. In fact, upon the brief submitted by the Attorney-General for the State after the trial of this claim, there appears the following statement: " Claimant was never declared an incompetent. He was never committed to an institution for the insane. Wassaic State School is not a school for the insane. He was discharged from the institution a short time after he became twenty-one years of age, and it is conceded now that he is perfectly competent. There is no proof in the case that he was insane or incompetent. After he was discharged from the institution he immediately went to work and was paid from $40 to $50 a week for his service. Certainly his appearance on the witness stand did not indicate that he was incompetent. I would say that he was quite normal and perhaps above the average ".

. The letters in evidence written at claimant's request to the doctors at the school (Exhibits 2, 6), one dated May 6, 1942, containing a request that he " be given a chance to go home to be with my brother and sister ", and the other written in January, 1944, with reference to the matter of obtaining compensation for the injury to his hand, apparently evidencing an interest in protecting his interests, and his action in consulting and invoking the aid of counsel to protect his interests as he has done here, his appearance on the witness stand, his testimony both on direct and on cross-examination, and his ability to obtain and hold employment, together with the other evidence on this point already indicated herein, indeed all pointed to the competency of claimant upon his discharge from the school and at the time of the trial. (*Jacobs* v. *Jacobs,* 127 Misc. 505.)

Notwithstanding the foregoing, and while claimant has had some success in obtaining employment and retaining the same since his discharge from the school, it is the fact that claimant is of a retarded mentality which undoubtedly will militate against him in his quest for a means of livelihood in the future when the present critical labor shortage shall have ceased to exist, and when services such as this claimant may be able to render may be more easily procured by those having need for them. The injuries sustained by claimant would be very

serious to anyone receiving them; but in view of claimant's background and circumstances, it seems to us their resultant impact upon him has been aggravated.

Reservations made by the court during the trial to be disposed of upon the decision herein are resolved as follows: Claimant's Exhibit 9, S. M. 139, and last question on S. M. 136 to same purport, with claimant's modification at S. M. 160 are admitted; and defendant's motion with reference to said Exhibit 9, S. M. 190, is denied. Claimant's Exhibit 10 is admitted, except for the following parts thereof: The second paragraph thereof, to wit: " The patient stated  *  *  *  in the machinery "; and the last paragraph thereof, to wit: " A telegram  *  *  * in his welfare ", which parts are specifically excluded. Claimant's Exhibit 11 is admitted except for° the follcwing parts thereof which are specifically excluded: The second paragraph thereof, to wit: " Patient corroborates  *  *  * had worked loose "; the third paragraph, to wit: " Further investigation  *  *  * proceeding "; and all matters set out under the headings contained therein, to wit: " Names of Witnesses ", " Disciplinary measures taken ", and " Names of Relatives, Friends, or Committee notified". (*Anthus* v. *Rail Joint Co.,* 193 App. Div. 571; *Davison* v. *Long Island Home, Ltd.,* 243 App. Div. 791; *Brenna* v. *Hulkower,* 262 App. Div. 1023; *Reed* v. *McCord,* 160 N. Y. 330, 341.) Evidence introduced under reservation at S. M. 179 is deemed connected up and is admitted. That part of Anderson's testimony on experiments at S. M. 330–333 is stricken out although the question is academic because other testimony of experiments had been received without objection by the claimant. That part of Dr. Gilmour's testimony at S. M. 429–430 is stricken out as not having been connected up. Claimant's motion to amend item 7 of his filed claim so as to raise his total demand for damages from $35,000 to $60,000 is hereby granted (*Partridge* v. *Fidelity & Casualty Co.,* 213 App. Div. 8, and cases cited) although in our opinion claimant's demand as contained in his filed claim is ample. Defendant's motions made at the end of claimant's case and at the end of the entire case are respectively denied. The foregoing rulings are made with an exception saved to the party or parties deeming themselves aggrieved thereby.

We, therefore, make an award herein to the claimant in accordance with the accompanying decision.

Let judgment be entered accordingly.