Whit Nunally, Claimant, *v.* State of New York, Defendant.
(Claim No. 29401.)

Court of Claims, February 10, 1950.

*David M. Fink, Jacquin Frank* and *Herman B. Gerringer* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Joseph A. Drago* of counsel), for defendant.

Sylvester, J. Claimant seeks to recover damages for injuries sustained by him while an inmate at the Woodbourne State Institution for Defective Delinquents.

Sometime during February, 1947, while assigned to the sorting room located on the second floor of the institution, claimant was required to proceed to the floor below to the main laundry room and bring back a basket of laundry. The basket, made of canvas with handles at opposite ends, was approximately two feet by two and one-half feet by one and one-half feet in size and weighed sixty-five pounds when full. Carrying the basket on his shoulder, he made his way up the stairway and came to the landing separating the first section of the stairway from the second. Another inmate, one Chico, was then in the process of mopping the second step of the upper section of the stairway. Chico, observing claimant on the landing, stepped aside to permit

him to pass.  Seeing the wet and soapy condition of the step, claimant stopped, because, as he said, '' I didn't want to fall with the basket.''  The size of the basket, which was carried on his shoulder, required his hands to be raised two and one-half feet above his shoulders.  Thus, he was unable to avail himself of the handrails on either side of the stairway.  There is testimony that the rules of the institution required full baskets to be carried by two inmates, though it is evident herein that the rule was not being strictly enforced.  A guard, stationed at the head of the staircase, seeing the claimant hesitate, commanded him to '' come on ''.  In obedience thereto, the claimant proceeded up the second section of the staircase and fell as he reached the second step, hurting his knee.  Picking up the basket, he came to the top of the stairway where the guard was stationed.  The claimant, in answer to the guard's question, informed him that he had hurt his knee.  Sometime later, he was admitted to the hospital where he remained for some fourteen months prior to his discharge from the institution.  While claimant was in the hospital, he again fell on his knee.  This second fall was not attributable to the original injury, though it aggravated his condition.  Were it not for this second fall his present condition might possibly be less severe.  There is a difference of medical opinion as to whether claimant's injuries were traumatic in origin, as Dr. Rubin testified.  The orthopedist called by the State, and who examined the claimant while the trial was in progress, diagnosed the injury as tubercular in origin.  The testimony of Dr. Rubin, who treated claimant for approximately one and one-half years at Woodbourne and who is still employed there by the State, is more acceptable.

When discharged from the hospital, claimant's disability consisted of a limitation of motion in the knee to the extent of 70% which progressed to a limitation of 100% on the day of trial.  There was also considerable swelling extending up the thigh about two thirds the distance from the knee, all of which is attributed by Dr. Rubin to the original blow to the knee, though aggravated by the subsequent fall.  In his opinion, the condition is a permanent one.

The record is not clear as to the date of the accident.  The court is satisfied it was sometime during February, 1947.  Claimant testified it was February 3, 1947, whereas Dr. Rubin stated claimant told him it was February 28, 1947.  Claimant's recollection of time and dates is not impressive.  For example, on direct examination he testified he worked on the mangle in

the laundry for a period of one month. On cross-examination, he stated it was five months. The accident, as described, could not have occurred on February 28, 1947, since that was a Friday when laundry was sent down to the main floor to be cleaned. The testimony is to the effect that the baskets would be sent downstairs on Thursdays and Fridays for laundering and returned upstairs to the sorting room on Mondays and Tuesdays. On February 3, 1947, Green, a guard, regularly employed at the institution, was on duty at the head of the stairway. He was on vacation, however, for three weeks during February and March. Claimant testified that a substitute guard was at the head of the stairway on the date of the accident and it is undisputed that claimant first reported for treatment to Dr. Rubin on March 4, 1947, which, according to the claimant, was three weeks after the occurrence. The court is persuaded that Green, the regular guard, was then on vacation and that the substitute guard, who was not produced upon the trial, was on duty when the event occurred sometime during the month of February, 1947.

The State contends that there can be no liability in these circumstances, and relies upon cases dealing with a situation where persons have fallen on stairs in the process of being washed. (*Samuels* v. *Terry Holding Co.*, 227 App. Div. 68, affd. 253 N. Y. 593; *Curtiss* v. *Lehigh Valley R. R. Co.*, 194 App. Div. 931, revd. in Court of Appeals 233 N. Y. 554, on the dissenting opinion of KELLOGG, J., in the court below; *Norwood* v. *Schacher*, 270 N. Y. 555). In the *Samuels* case (*supra*), the janitor was engaged in washing the stairs from the fifth to the fourth floor. Some of the soapy and greasy water had trickled from this stairway down to the one leading from the fourth to the third floor. Plaintiff, coming out of her apartment on the fifth floor, had proceeded down the stairway which the janitor was engaged in cleaning. As she came to the top step of the flight of stairs leading from the fourth to the third floor, she slipped upon the soapy water which had accumulated there from the washing of the stairs above. The court (per FINCH, J.), said (pp. 69–70): " If the plaintiff had slipped upon the stairs which were then in the process of being washed by the janitor, there is clear authority that no liability would be occasioned. As was said in a case where plaintiff was injured by slipping upon the floor of a railroad station while it was being washed, in the dissenting opinion of Mr. Justice HENRY T. KELLOGG (now Judge KELLOGG) in *Curtiss* v. *Lehigh Valley R. R. Co.* (194 App. Div. 931), upon whose dissenting

opinion the judgment and order were reversed in the Court of Appeals (233 N. Y. 554): ' We find no support, either in reason or in authority, for holding that there was any proof of negligence on the part of the defendant for submission to a jury.' ''

But the case at bar is clearly distinguishable from the cited cases by reason of the additional fact that claimant was ordered to '' come on '' when, on seeing the wet and soapy condition of the second step, he had stopped on the landing of the staircase. Being under the direct supervision and direction of the guard, he was thus obliged to obey the order to proceed or suffer the possible consequences of his refusal. Unlike the *Samuels, Curtiss* and *Norwood* cases (*supra*), where there was a free choice or discretion to proceed into the dangerous area, the claimant herein, though indicating his reluctance to proceed upon the soapy step, was afforded no choice in the premises. Only at his peril could he refuse to obey the command to '' come on ''.

In *Scalia* v. *State of New York* (147 Misc. 622 [Court of Claims, 1933]) ACKERSON, J., said (pp. 624–625): '' He was not a free agent. His liberty of action had been temporarily taken away by the State in order to punish him for the crime he had committed. But his segregation from society and his confinement in a prison was the utmost limit of authority which the law gave the State over him. It could not injure his health nor his body with impunity. If the State compelled him to perform labor which brought him in contact with machinery capable of inflicting serious injury upon him, the State thereby assumed all the responsibilities which its own rules and regulations had placed on employers in the industries of the State operated by free labor. The fact that he was not a free agent, that he had no choice to do anything except as he was ordered to do, that he did not voluntarily assume any of the risks or liabilities of his occupation, might well be considered as placing upon the State a much higher degree of responsibility for his safety than that resting upon the employer of free labor in the industries of the State.''

And in *Lee* v. *State of New York* (187 Misc. 268 [Court of Claims, 1946]) LAMBIASE, J., said (p. 282): '' Claimant was not a free agent and was not able to do as he pleased. His liberty of action had been temporarily taken away by the State through his commitment as a mental defective. He had no choice to do anything except as he was ordered to do, and he did not voluntarily assume any of the risks or liabilities of his occupation.'' Analogous in this respect are the so-called merchant-seamen

cases where obedience to command is compulsory. (*Masjulis* v. *United States Shipping Board,* 31 F. 2d 284.)

Upon the facts of this case, it is concluded that the State is liable to respond in damages which are awarded to .the claimant in the accompanying findings.