Froessel, J. (dissenting).
Upon the findings below, amply supported by the evidence in this record, and in light of the cases hereinafter cited, I am of the opinion that the judgment appealed from should be affirmed.
Irving Hirsh, claimant’s decedent, died by suicide on September 4, 1953, while a mental patient at Brooklyn State Hospital. Hirsh, when admitted to the hospital on August 21, 1953, had a record of mental illness dating back to 1933, which included numerous attempts at suicide. His suicidal propensities were known to the authorities at Brooklyn State. He had been there previously in 1938-1939. He was returned to Brooklyn State in 1953 as a direct result of two attempts at suicide which occurred during the immediately preceding three weeks. On August 2, 1953 Hirsh, then a patient at the High Point Hospital in Port Ohester, New York, attempted suicide “by taking an indeterminate number of phenobarbitol tablets which he had secluded in Ms room ” (emphasis supplied). His second attempt during that period was by hanging.
In view of his record, the examining physician at Brooklyn State noted in his report that Hirsh “ need[ed] * * * constant nursing attention ”. He was placed in the suicidal ward, known as Ward 5. That ward, consisting of several dormitories ranging in size from 2 to 12 beds — decedent’s dormitory had 12 beds—was directly supervised by attendants and nurses. There were three tours of duty, or shifts, among the attendants and nurses: the first from 8:00 a.m. to 4:00 p.m.; the second, known as the ‘ ' evening shift ’ ’, from 4:00 p.m. to 12:00 midnight ; and the third, known as the ‘ ‘ night shift ’ ’, from 12:00 midnight to 8:00 a.m. It was during the evening shift that the patients in Ward 5 were put to bed.
The duties — as generally described at the trial—of the members of the hospital staff who worked on the evening shift were “ To observe patients, to help them in their needs, feed, clothe them, to carry out the orders of the physician and the nurses in charge of the service ’ ’; and more particularly it was their responsibility to “ examine clothing and the beds of the suicidal patients ”. Those engaged on the night shift, at which time the patients would be sleeping, would “ make rounds at frequent intervals ” of the various dormitories in Ward 5. Their inspec *129 tions were of a cursory nature, looking ‘ ‘ to see if the patient was all right and in good condition ’ \ At 6:00 a.m. the patients would be awakened, and the night shift attendants would see to it that they dressed and were taken to breakfast.
On the morning of Friday, September 4th, the night shift attendant attempted to awaken decedent Hirsh but he failed to respond. A physician was summoned who pronounced Hirsh dead. That physician, Dr. Cohen, testified that Hirsh appeared to be in a “ deep sleep. ”. He was clad only in shorts — the bed attire customarily worn by the patients in Ward 5. A search was made of the immediate surroundings, but no containers or boxes were discovered.
An autopsy performed subsequently disclosed that Hirsh died by barbituric poisoning, and claimant’s expert testified that the 19 grains found establish that decedent had ingested 12 to 15 seconal capsules of the gelatin covered type. When he was found dead at 6:00 a.m., his body was still warm and there was no sign of lividity, indicating that he had expired 1 to 2 hours previously. The quantity of seconal which he had taken was capable of producing death within from 1 to 6 hours. Hence Hirsh could have taken the seconal at any time 'after 10:00 p.m. on September 3d.
The record does not reveal the method used by decedent to acquire the seconal capsules. That is a subject of some speculation. There was conflicting testimony as to whether seconal was kept at Brooklyn State Hospital. In any event, since visiting days were on Wednesday and Saturday, decedent could not have had visitors on Thursday, the day before he died. None of decedent’s relatives remembered at the trial when they last visited him. The trial court, after seeing them and hearing them testify, expressly dismissed any speculation that they might have brought decedent the seconals.
It is obvious, moreover — and the trial court so found—that, regardless of the method used by Hirsh in acquiring the seconals, he managed to keep the 12 to 15 capsules secretly hidden from the hospital staff for whatever period he had them. The failure of the hospital staff to find the drugs before they could be used by Hirsh for self-destruction was negligence. It is my opinion that this finding of negligence by the Court of Claims, which *130 was affirmed by the Appellate Division, is amply supported by the evidence in this record, and we are precluded from disturbing it.
As previously pointed out, the authorities at Brooklyn State Hospital had abundant knowledge of decedent’s suicidal propensities, and, in particular, knew that he had attempted suicide on a prior recent occasion by means of ingesting barbiturates which he had secluded m Ms room ’ ’. Previously decided cases make it clear that such knowledge on the part of the hospital authorities merits weighty consideration in determining whether they were negligent in preventing the self-infliction of harm by a mental patient committed to their charge (Martindale v. State of New York, 269 N. Y. 554; Shattuck v. State of New York, 166 Misc. 271, affd. 254 App. Div. 926; see, also, Weihs v. State of New York, 267 App. Div. 233; Gries v. Long Is. Home, 274 App. Div. 938; Curley v. State of New York, 148 Misc. 336, affd. sub nom. Luke v. State of New York, 253 App. Div. 783). “ The degree of care to be observed is measured by the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution” (Zajacskowski v. State of New York, 189 Misc. 299, 302).
Thus, in the Martindale case (supra), for example, the decedent died after escaping the institution by removing a “lug ” from a window. The State had notice, in light of a previous attempt of decedent to escape by the same method—namely, removing a “ lug ” from a window. We affirmed a finding for the claimant on the ground that the State was liable for the negligence of its officers in failing to protect the window, and in failing to provide constant supervision of the patient after kowledge of her desire and propensity to escape. Similarly, the Shattuck case (supra) involved a mental patient with a known propensity to escape by climbing through an unlocked top portion of a window. The State was held liable for injuries sustained as a result of a second escape by^the same method. In the ease now before us, the authorities at Brooklyn State Hospital-—having knowledge of decedent’s past attempt at suicide by means of barbiturates “ secluded in his room "—failed to take the precautions reasonably necessary to prevent a recurrence of the act.
*131 The standard of care, or procedures, commensurate with the risk to be perceived, which should have been followed by the hospital authorities in this case, were outlined by plaintiff’s expert witness at the trial. In view of decedent’s “ mental history ”, he stated that proper standards required a “ search of personal effects and the immediate surroundings ’ ’ frequently each day: “I would have instructed my attendants to search Irving from head to foot before they put him to sleep, and to search him several times during the day to examine him several times during the day and to examine Ms person and every part of his personal effects, and because of these suicidal tendencies I would have reminded and especially alerted the personnel and also the fact that he was a potentially barbiturate suicide, and if I may say so, counsel, I would have alerted them to the fact that they can’t be sure that they have checked carefully unless they had searched Mm repeatedly, and unless they did a thorough, and I mean a thorough searching by means of palpating every part of his body and all of his clothing and —- ”.
In accordance with the outlined statement of procedures, which are undisputed, the Court of Claims found that it was the “ responsibility ” of the “ Evening Shift ” (emphasis supplied) to “ examine the patient’s clothing and inspect his immediate environs to determine and discover any irregularities that would indicate a suicide attempt,” (Finding of Fact Ho. 11.) These “simple rules” the Court of Claims found were “violated.” by the State, particularly in that “ The employees of the Evening (4 P.M. to 12 Midnight) Shift failed to adequately inspect and examine Hirsh’s clothing' and bed on September 3rd, 1953” (Finding 12) and “ The State’s employees failed to adequately care for, supervise and have under surveillance Irving Hirsh on the Mght of September 3rd-4th, 1953.” (Finding 22; see, also, Findings 14, 23, 24,)
Such findings—-which the Appellate Division affirmed-—are' justified in light of the proof in this record that Hirsh consumed 12 to 15 gelatin covered capsules of seconal. Such a quantity of capsules comprises a substantial physical bulk. Had the staff properly palpated Ms body, checked Ms clothing, bed and environs as they were duty-bound to do, the seconal would have been uncovered. The situation would be far different if we were *132 dealing in this case with a suicide committed by - means of ingestion of a few diminutive pills.
There is also evidence in this record that the staff were never alerted to the fact that decedent was a potential barbiturate suicide, and that he had once attempted such a suicide by means of barbiturates secluded in his room—notwithstanding the fact that the hospital authorities knew of this. The five attendants who served on the evening shift on September 3, 1953 did not testify at the trial. They had resigned since Hirsh’s death. However, the nurse in charge on that shift was present at the trial and testified as follows:
“ Q. Did you have anything to do with searching the environs of the patients to see if they were hiding medication? A. Not unless I had reason to be suspicious.
“ Q. Did you at that particular time in September or around September 3rd, 1953 know that Irving Hirsh had at one time attempted suicide by taking an indeterminate amount of phenobarbital? A. I don’t recall, I knew at the time —
“ Q. Nobody told you about that? A. No, sir.” (Emphasis supplied.)
One of the attendants on the night shift at the hospital during the time that Hirsh was there testified that he had not been given any special instructions with regard to Hirsh; and when asked if he knew that Hirsh “ had attempted "suicide by taking barbiturates on a prior date than his date of admission to Brooklyn State”, he replied: “No, I didn’t know that.” (Emphasis supplied.)
The majority of the Appellate Division in its opinion for affirmance in .this case took note of the fact that decedent Hirsh had consumed 12 to 15 capsules of seconal, and aptly observed that ‘ ‘ Each case must be decided on its own merits but the rule is clear (Van Patter v. Towns Hosp., 246 N. Y. 646; Paige v. State of New York, 245 App. Div. 126; Martindale v. State of New York, 269 N. Y. 554) ”—namely, “ that the State is liable for the failure of its hospital personnel to take reasonable and necessary precautions to protect mental patients from self-inflicted injuries.”
Such “ reasonable and necessary precautions ” were not taken by the hospital authorities or staff in this case. It is stated in the majority opinion of this court that it was the regular prac *133 tice for the night shift attendants to put the patient to bed after examining his clothing and bed, which included the removal of the mattress and inspection under the bed by the attendant, although these attendants did not report for duty until midnight. However, the record in this case discloses only the duties of the hospital staff as outlined earlier in this opinion—not that they were in fact performed. Indeed, there is absolutely no evidence in this record that these duties were performed or any practice or custom carried out on the morning, afternoon, evening or night of September 3, 1953, the day immediately preceding the fatal early morning hours of September 4th when Hirsh expired from barbituric acid poisoning. The record does contain evidence that the mattress was removed and a search conducted underneath the bed of Hirsh and in that entire area, but that was done only after 6 o’clock on the morning of September 4, 1953, after the attendants bad found Hirsh dead in his bed.
Inasmuch as there is ample evidence here in support of the facts found by the Court of Claims, and these findings have been affirmed by the Appellate Division, we have no alternative but to affirm.
Chief Judge Desmond and Judges Dye and Burke concur with Judge Van Voorhis; Judge Froessel dissents in an opinion in which Judge Fuld concurs; Judge Foster taking no part.
Judgment reversed, etc.