Nicolina Frate, as Administratrix, etc., of Frank Frate, Deceased, Appellant, *v.* The State of New York, Respondent. (Claim No. 19462.)

Third Department, November 13, 1935.

*Leary & Fullerton [James A. Leary, Walter A. Fullerton* and *S. H. Keating* of counsel], for the appellant.

*John J. Bennett, Jr., Attorney-General [John L. Campbell, Assistant Attorney-General,* of counsel], for the respondent.

CRAPSER, J.   The claim is for the negligence of the State of New York, its officers, agents and employees, in constructing and maintaining at Ray Brook, N. Y., at the sanatorium in said place, coal bunkers, the construction of which is and was wholly defective; that the covers of said coal bunkers were improperly constructed, were of insufficient width, that they were allowed to become decayed and dilapidated.

It is claimed that while the decedent was engaged in the performance of his duties as section foreman in the employ of the Delaware and Hudson Company, and while he was making an inspection along the top of the coal bunkers located at the power house of said hospital, without fault or negligence on the decedent's part, but by reason of the negligence of the State of New York, one of the covers of said coal bunkers gave way and precipitated the decedent some twenty feet to the bottom of said bunkers, causing injuries from which he died.

The administratrix has received $6,000 from the Delaware and Hudson Company, but expressly reserved the right to continue any claim against the State of New York.

The coal bunkers which were involved in the accident were cement bins from fifteen to twenty feet high and twenty-five to thirty feet wide and ninety feet long.   There were three large bunkers and a smaller one with a partition between each.   The coal for the hospital was kept in these bunkers.   There was a roof over the bunkers and on top of the roof were laid railroad rails, two or three feet above the roof.   There were two large yellow pine timbers, ten by fourteen inches, over the tops of the bunkers.   The rails were laid on top of these timbers, approximately in the center.   The distance between the rails was fifty-seven inches and the distance between the stringers was forty-five and a quarter inches.   The timbers extended inside and outside the rails.   Cars carrying coal were run up on this siding and emptied directly into the coal bunkers.   The bunkers had wooden covers or sections which covered the space between the rails and over the bunkers; they were about fifty-four inches wide and uniform in width except for natural wear.   These covers were kept loose with a ring on them to lift them so that they could be taken off when it was desired to dump coal into the bins, the coal falling between the rails and timbers on which the rails were laid. This was all on the property of the State.   When in need of repairs

the engineer notified the steward who in turn notified the carpenter who was in charge of the repairs. The bunkers proper and the covers to them, where the accident happened, were built and maintained and owned by the State.

It is conceded that the decedent died from the injuries which he received in falling from the top of the coal bunkers, between the tracks, into one of the coal bunkers, and that he was up there in the due course of his duties.

There was no eye witness to the accident. An employee of the hospital, who had been wheeling in coal, came back from wheeling in a load and saw the decedent on the floor beside a wheelbarrow with his head leaning against the frame of the wheelbarrow and the cover of the coal bunker which had come from overhead was lying near by, also his hat and a hammer and some spikes. A few minutes before the cover had been in its proper place and after the accident the cover lay on the floor of the bunker. The cover could be pushed far enough to one side or the other so that it would go past the flange on either side so that there would be no support on that side.

The edges of the stringers had been worn for two or three years by the coal falling into the bunkers and the ends of the covers had been somewhat worn. There were some holes on the outside of the track where cars that were not self dumping could be unloaded but these were covered up. The covers were constructed by nailing boards about an inch thick onto two by fours, on the flat side of the two by fours. The two by fours ran crosswise of the opening, that is parallel to the rails.

A man could have free passage on the outside of the rails except for some coal lying there along the track; it would be up to his knees; he could not drive spikes or wedges or repair the track.

Directly after the accident it was noticed that new spikes had been driven on the inside of the left-hand rail, facing toward Lake Placid. It would have been necessary for the person driving the spikes to have stood between the rails. There were some driven almost directly over the opening; they were in the immediate vicinity and over the cover. The ends of the covers were champered to the extent of a couple of inches. The covers were narrower than the space between the rails. The top of the stringers was not as wide as the bottom of the stringers and the stringers had been worn off by coal being dumped down into the pockets.

One witness went into the coal bunker and saw the cover leaning against the wall, a smoking pipe and one or two spikes on the floor. The cover was well weather beaten and the ends champered as though something had run over them. There were two spikes and a track gauge on the top of the power house near the place where

the decedent fell through. The track gauge was six or eight feet back from where the accident happened; it was laid across the rails and had two jiggers between the rails, and was used for the purpose of determining that the rails were the standard width apart.

The railroad company took care of the track and the decedent had at times given orders for the shoveling of snow and for other work over the bunkers so that cars could be run up to discharge coal.

It was conceded that the decedent was injured in the course of his duty.

There being no eye witness to the accident and the proof of the accident depending upon circumstantial evidence it is sufficient if certain facts were established and the surroundings shown so that from a reasonable inference the logical conclusion could be reached that the injuries resulted from negligent acts. In a death case the claimant's proof must needs be meager.

From the testimony and the concession by the State it is clear that the decedent was engaged in the performance of his duties between the rails when he met his death. The cover and the decedent came down at the same time. Notice had been given by Brewer to his superiors about having the covers repaired but no repairs had been made. The covers were so constructed that if they were pushed from one side to the other they would go down. If the decedent had been in the employ of the State clearly the State would have owed him the duty of providing him a safe place to work.

The track was constructed by the railroad company at the request of the State; the State owned the track but the same was subject to inspection and maintenance by the railroad company. The State built and placed the covers between the tracks without any consultation with the railroad company. The decedent was upon the structure in the performance of his duties, he was not a trespasser, he was a business visitor and the State owed him the duty to keep these covers in proper condition. In such circumstances the presence of a known danger, dependent upon a known cause, makes vigilance a duty. It is a duty, as a matter of law, to safeguard life and limb when the consequence of neglect may be foreseen.

The State under the circumstances was bound to inspect the use that the decedent made of the tracks and the coverings and is liable for its failure to make proper inspection and repair since it was its duty to provide a safe place where the decedent could make his inspection and small repairs. (*Murphy* v. *Rochester Telephone Co.*, 208 App. Div. 393; *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382; *Glanzer* v. *Shepard*, 233 id. 236, 239; *Quigley* v.

*Thatcher,* 207 id. 66, 69; *Standard Oil Co.* v. *Anderson,* 212 U. S. 215; *Kirchner* v. *State of New York,* 223 App. Div. 543.)

The decedent was alone upon the structure in the due course of his duties. The structure was constructed and owned by the State and maintained by the railroad. The decedent and the cover came down at the same time, nearby was the decedent's hammer, his hat, his pipe and some spikes. There were two spikes inside the rails that had not been driven, there was a track gauge six or eight feet back of where the decedent went through. All of the proof showed that the decedent was engaged in the performance of his duties at the time of his death. The decedent could not see the supports on which the covers rested. There was nothing to apprise him that when the covers were pushed to one side they would fall through. There was no proof in the case that the decedent was familiar with the construction of the covers on this spur. He had the right to rely upon the apparent facts. (*Kirby* v. *Montgomery Brothers & Co.,* 197 N. Y. 27, 32.)

The burden was upon the State to show that the decedent was negligent. There is no evidence in the case that shows negligence on the part of the decedent. The fair preponderance of evidence shows that the State was negligent in the way that it maintained the covers. It had permitted them to become worn and the timbers upon which they rested had become worn; notice was given that they needed repairs and the repairs had not been made and no sign was put up nor was anything done to warn the decedent of the danger that he was in in performing his duties.

The judgment dismissing the claim should be reversed and the matter remitted to the Court of Claims for the purpose of making an award to the claimant.

HILL, P. J., and HEFFERNAN, J., concur; RHODES and BLISS, JJ., dissent.

Judgment dismissing complaint reversed on the law and facts, with costs, and matter remitted to the Court of Claims for the purpose of making an award to claimant.