SAM ROOT, as Administrator of the Estate of MORRIS ROOT, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant.

(Claim No. 26057.)

Court of Claims, April 2, 1943.

*Frederick M. Garfield* and *Irving Schonwald* for claimant.

*John J. Bennett, Jr., Attorney-General* (*Gerald J. Carey* of counsel), for defendant.

GREENBERG, J. Claimant's intestate, after having attempted to commit suicide by slashing his wrists, was admitted to Bellevue Hospital on September 26, 1940, and while under observation there made another attempt at suicide. Thereafter, by an order of commitment duly made in the Supreme Court, he was on October 8th admitted to the Rockland State Hospital. On his admission, the authorities at the State hospital had the information of his former attempts at suicide and, after examination, diagnosed his ailment as dementia praecox, paranoid type. He was considered a suicidal paranoiac and was assigned to Ward 17, which was known as a suicidal ward, where treatment prescribed for patients was that ordinarily given to suicidal cases excepting those whose tendencies towards suicide were continually evidencing themselves.

At about 7:20 P. M. on November 3, 1940, the deceased and about five or six other patients were taken by one of the State attendants from the day room for the purpose of making up beds in the ward, which consisted of sixteen single rooms and two dormitories of five or six beds each. The deceased and two other patients went into one of the dormitories, presumably to make up the beds. While they were there, the attendant in charge of the deceased went with the other patients down the corridor adjoining the wards, unlocking the doors of the bedrooms so as to admit the other inmates who were to make up the beds in those rooms. While the other two inmates apparently proceeded to make up the beds, the deceased managed to remove the belt from his trousers and placed same around his neck and hung himself from a slide bar which controlled the window in that room. One of the other inmates, upon noticing what had taken place, screamed, whereupon the attendant in charge

of the deceased, who had been unlocking the bedroom doors in the ward, immediately came into the dormitory and released the decedent from the window and, together with another attendant who was left in charge of the day room, and some three doctors, administered artificial respiration, which was of no avail, and the deceased succumbed at approximately 8:45 that evening. Only about five minutes had elapsed from the time the attendant had taken the deceased and the others from the day room until he heard the scream.

The State is duty bound to furnish inmates of its hospitals for mental defectives with every reasonable precaution to protect them from injury, either self-inflicted or otherwise. (*Shattuck* v. *State of New York,* 166 Misc. 271, affd. 254 App. Div. 926; *Martindale* v. *State of New York,* 244 App. Div. 877, affd. 269 N. Y. 554.) While the degree of care owing to its inmates may be more exacting because they are wards of the State and the State is the guardian of their well-being and safety, the State, nevertheless, is not an insurer of the safety of the inmates of its institutions. There was no duty upon the State to maintain individual and constant supervision over the deceased herein. The State's employees and physicians had knowledge of the deceased's mental condition and had classified him as a potential suicide, but the record discloses the fact that he was not a case for isolation or for a restraining garment. He was not assigned or kept in a disturbed ward but had, as appears from the hospital record, shown signs of improvement, was co-operative, and had on occasions made statements and indicated to the physicians that he no longer entertained any thought of doing away with himself. There was nothing about his mental condition to warrant having other care or treatment than was administered to him. It is not disputed that the making of beds was a form of occupational therapy, which is a method of treatment of the deceased's condition.

The attendant was in the corridor adjoining the dormitory into which the deceased and two other inmates went for the purpose of making up the beds. While it is true that the attendant did not constantly have the deceased within view, there was reasonable surveillance and watchfulness on his part over the deceased and the others in that group. There was nothing about the deceased's condition to justify any reasonable perception of any risk in allowing him in the dormitory with the others making up beds. He had done that on a number of previous occasions. Furthermore, there is no duty on the State to maintain individual supervision for each potential suicidal

case. Any such rule of law would place an unreasonable burden upon the State and the authorities in charge of insane patients, and would also be contrary to the accepted methods of treatment of such patients. It also appears from the record herein that to keep a patient cooped up in one room and to limit his activities and prevent his taking part in work, in doing something useful about the ward, is harmful; and that as patients lose or have lost their suicidal tendencies, they are given more leeway.

Negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of. " Negligence is to be gauged by the ability of one to anticipate danger. The test of actionable negligence is not what could have been done to have prevented a particular accident, but what a reasonably prudent and careful person would have done under the circumstances in the discharge of his duty to the injured party. Failure to guard against a remote possibility of accident, or one which could not, in the exercise of ordinary care, be foreseen, does not constitute negligence." (*Lane* v. *City of Buffalo*, 232 App. Div. 334, 338.)

There was nothing in the dormitory or about the window at which the decedent hung himself that would have lead a reasonably prudent person in charge of the deceased herein to perceive that the deceased would attempt suicide in the presence of the other two inmates at that time and under the circumstances herein stated.

The cases of *Robertson* v. *Towns Hospital* (178 App. Div. 285), *Shattuck* v. *State of New York* (*supra,* 166 Misc. 271, affd. 254 App. Div. 926), *Spataro* v. *State of New York* (166 Misc. 418), *Martindale* v. *State of New York* (*supra*), and *Dimitroff* v. *State of New York* (171 Misc. 635), cited by the claimant, are not controlling herein. The facts in each of said cases are quite different from those in the case at bar. In the *Robertson* case, a window was permitted to be unguarded, which allowed the escape; in the *Spataro* case, a vat containing hot liquid soap was allowed to be unguarded and within reach of the inmate; in the *Martindale* case, a window was permitted to be in such condition as to allow the removal of a lug and enable the inmate to escape; in the *Dimitroff* case, there was no surveillance or attendance or watch of the inmates in a disturbed ward for at least an hour, and in the *Shattuck* case, a window was allowed to be in such condition as to enable the inmate to open the same and to escape therefrom.

The claimant having failed to prove negligence on the part of the State, as a result of which the deceased met with his death, claimant has failed to make out a cause of action, and the claim herein should be dismissed.