Alexander Del Gtorno, J.
This is a claim by Alice Hirsh, the administratrix of Irving S. Hirsh, to recover damages for the death of Irving S. Hirsh, caused by the alleged negligence of the State. At the time of his death decedent was 38 years of *361 age. He left him surviving his widow, the administratrix, appointed as such on September 23, 1953, and two children aged 12 and 10. The claim herein was filed on December 3, 1953 and has not been assigned.
The deceased died by suicide on September 4, 1953, while a patient at Brooklyn State Hospital, as a result of taking an overdose of seconal, which is a barbiturate derivative used as an hypnotic sedative.
The administratrix charges that the State was negligent in the maintenance, supervision, care and control of the deceased, an incompetent with known suicidal propensities, as a result of which he was enabled to take the overdose of seconal causing his death.
The medical history of the deceased shows that he was born in Russia on March 31, 1915 and was brought to the United States in 1921. With a psychosis considered to have started' in 1933, he was admitted to New York Psychiatric Institute on May 20, 1938, where he was diagnosed as manic-depressivehypomanic phase. There as a voluntary case, he presented his request for discharge. Before the required 10-day period for observation had elapsed, he became restless, broke some window panes, threatened to kill some people and required restraint. He was removed to the Bellevue Observation Ward on June 1, 1938, where he remained until June 6, 1938, at which time he was admitted to Brooklyn State Hospital. At that hospital he was diagnosed on admission as dementia prascox, paranoid type. He was paroled on January 6,1939 in the custody of his father, who returned him to the hospital on June 17, 1939. On July 15, 1939, he eloped from the hospital and was classified as a parolee by escape. On May 3,1940, he was discharged from parole with a discharge diagnosis of dementia prascox, catatonic type, condition-recovered.
On December 3, 1952, he was admitted to New York Hospital, Westchester Division, the diagnosis of his condition being manic depressive psychosis, circular type, and remained there until March 1, 1953. He returned home and began working with his father in the insurance business. Shortly thereafter he became depressed and began talking of suicide. On June 13, 1953, he was admitted to High Point Hospital for intensive psychotherapy. He ran away from the hospital but returned. While there, he made two attempts at suicide, one with phenobarbital and the other by hanging, and was then placed upon 24-hour special nursing care on a five-minute check. On August 21, 1953, he was discharged as dementia prascox, paranoid type, condition unimproved, and was transferred to Brooklyn State *362 Hospital. On that day, the Brooklyn State hospital record indicates that he had made “numerous suicidal attempts” with severe depression. Nembutal and luminal were prescribed for him. At the time of hospitalization, he was noted as being depressed and agitated and showing signs of flight of ideas and expressing suicidal tendencies. The diagnosis was manic depressive — depressed type.
Information obtained by the hospital indicated that two of his mother’s brothers had died by suicide and that other members of his mother’s family showed evidence of having neurotic tendencies. At the time of decedent’s admission to Brooklyn State Hospital, one of his cousins was a patient in Kings Park State Hospital. His own brother had committed suicide.
The record reveals more concerning the family background of the decedent, such as his concern about what he thought was his impotence, despite his fatherhood of two surviving children; his preoccupation with the destiny of the world; his inability to concentrate for any length of time upon any one subject. The record shows also the numerous types of insulin and shock treatments which were administered to him during his stay in the various hospitals. The court feels that it has culled sufficient of the facts to enable it fairly to evaluate the value of the expected life remainder of the decedent.
On August 26, 1953 and again on August 30, 1953, the wife of the decedent requested in writing that the hospital permit him to wear his own clothing instead of the usual hospital clothing. This permission was granted.
The hospital staff was divided into three shifts: 8:00 a.m. to 4:00 p.m. (Day Shift), 4:00 p.m. to 12:00 a.m. (Evening Shift) and 12:00 a.m. to 8:00 a.m. (Midnight Shift). Patients were put to bed during the time that the evening shift was on duty. It was the responsibility of those on that shift to examine the clothing of the patients and to inspect their beds to discover any evidence that might indicate a suicide attempt. There was no testimony offered by the State as to such examination and inspection from attendants who worked on the evening shift. One of the attendants on the midnight shift, Yelez, testified on an examination before trial that the decedent had not been checked for over three hours prior to the time of the discovery of his death at about 6:00 a.m. This witness was not produced at the trial. The chief attendant on duty, Pugh, testified on examination before trial that he would have had no reason to check the bed of decedent personally, that he did not recall going over to see him at any time while he was on the midnight shift, that he did not recall having seen the patient at the time *363 lie reported at midnight and that he did not think anyone would have had any occasion to check him. On the trial, about two months later, he said he had checked the bed of decedent at 5:00 a.m. ; that he had checked it at about 4:00 a.m. personally, and that other attendants had checked. He stated also that Yelez was under his supervision, that Velez had checked the bed at 5:00 a.m., 4:00 a.m:., and 3:00 a.m.
There was conflicting testimony also as to whether the drug seconal was stocked and stored at Brooklyn State Hospital. Mr. Borneo, senior pharmacist at the hospital, testified on his examination before trial, that prior to 1953, seconal was stocked and stored there although it was not a regular item. Dr. Glenn, supervising psychiatrist at Brooklyn State Hospital, testified that seconal was never kept at the hospital, and that there was no inventory or written record kept of drugs; that the only way to determine at any time the amount on hand would be by a physical count, records being kept only of what was received. Eomeo was not produced upon the trial, but a junior pharmacist, Miller, testified that seconal was ordered on December 8, 1953 and delivered on December 14, 1953.
The decedent committed suicide by barbituric acid poisoning.
Claimant’s witness, Dr. Scheinman, a psychiatrist, testified that decedent did not receive the proper attention for one with his suicidal tendencies and did not receive supervision, care and control in accordance with accepted practices. He further testified that in his opinion, if death had not ensued, the decedent most likely would have made a recovery and resumed his position in society comparable with the position he maintained prior to his illness and that he could have returned cured. Dr. Glenn, the State’s psychiatrist, stated that if decedent had lived, his prognosis would have been “ guarded ”, but that he would not completely eliminate the possibility that the decedent would have recovered and could have had a remission and returned to his wife and children and been able to work.
The court also takes judicial notice of the great strides that have been and are being made in the treatment of mental illness, with a consequent increase in the number of cures that are being effected.
The claimant, because of the circumstances involved, has not been afforded the opportunity of presenting eyewitness testimony. “In a death case a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence ”. (Noseworthy v. City of New York, 298 N. Y. 76, 80, citing McBride v. Brady, 234 App. Div. 882; Herbert v. Smith Paper Corp., 243 App. Div. 260, *364 263; Frate v. State of New York, 245 App. Div. 442, 445.) ‘ ‘ ‘ Where the defendant has knowledge of a fact hut slight evidence is requisite to shift on him the burden of explanation ’ ”. (Noseworthy v. City of New York, supra, citing Grifen v. Manice, 166 N. Y. 188, p. 194.) In the case of Frate v. State of New York {supra, p. 445), the court held that “ There being no eye witness to the accident and the proof of the accident depending upon circumstantial evidence it is sufficient if certain facts were established and the surroundings shown so that from a reasonable inference the logical conclusion could be reached that the injuries resulted from negligent acts. In a death case the claimant’s proof must needs be meager.”
In order to determine if the State has been negligent, the incident causing death must be considered in the light of the surrounding circumstances. “ Negligence, like any other fact, may be inferred from the circumstances, and the case may be such that, though there be no positive proof that the defendant has been guilty of any neglect of duty, the inference of negligence would be irresistible.” {Garrow v. State of New York, 268 App. Div. 534, 537, affd. 294 N. Y. 741.)
After considering carefully all of the testimony and all of the circumstances existing in this claim, the court finds that the State was negligent in the maintenance, care, supervision and control of the decedent.
It is conceded that at the time of his admission to the hospital, it was a known fact that decedent had suicidal propensities. The State had ample warning of the fact {Liddie v. State of New York, 190 Misc. 347) and the State violated simple rules which should have been followed so that he could not have taken his own life. {Goodman v. State of New York, Claim No. 31832.)
The decedent would have committed suicide only in either of two ways. Either he had the seconal in his clothing, in which case the hospital should have found and removed it, or he procured it in the hospital from the dispensary or storeroom or from a person in the hospital. In either of these cases, the State would have been negligent in its duty of care owed to the decedent, particularly since the State was aware of his suicidal tendencies.
In its brief the State makes the apparently serious suggestion, although admittedly speculative, that the only recorded visitors for the decedent, namely his father, mother or wife, may have brought him the seconal. If such were the fact, the court would dismiss the claim. There is not a scintilla of evidence, however, to substantiate such statement. Aware, moreover, that these relatives had done everything in their power to help the *365 decedent and to see him cured during the many years of his troubles, and having observed the wife and father on the witness stand, the court dismisses such hypothesis, deeming it unconscionable to hold that the parents or wife may have been guilty at best of the practice of euthanasia or at the worst of murder for profit.
In disclaiming liability, and in maintaining that the State was not under a duty to keep the decedent under constant surveillance, the State cites Root v. State of New York (180 Misc. 205) and Shattuck v. State of New York (166 Misc. 271, affd. 254 App. Div. 926). The Root case (p. 207) is distinguishable from the case at bar because there, although the deceased had been classified as a potential suicide, he had “ shown signs of improvement, was co-operative, and had on occasions made statements and indicated to the physicians that he no longer entertained any thought of doing away with himself. There was nothing about his mental condition to warrant having other care or treatment than was administered to him.”
In the Shattuck case, claimant was an inmate of a school for mental defectives. After one unsuccessful escape, he made a second escape and was later found frozen and unconscious, becoming a life cripple because of amputation of both legs below the knee. The court held the State liable, stating (p. 273) Public or private institutions maintained for the care of those unfortunates suffering from mental or nervous defects or diseases have imposed upon them the legal duty of taking every reasonable precaution to protect their patients from injury, either self-inflicted or otherwise. (Van Patter v. Town Hospital, 246 N. Y. 646; Paige v. State, 245 App. Div. 126; Curley v. State, 148 Misc. 336; Wilcove v. State, 146 id. 87; Phillips v. St. Louis & S. F. R. R. Co., 211 Mo. 419; 111 S. W. 109; Martindale v. State, 269 N. Y. 554.) ” The court held further (p. 274) that ‘ ‘ The State was forewarned by the first escape and should have taken proper measures to prevent the second. Failing to do so, it was guilty of negligence ”.
The State is responsible in the management of its schools, hospitals and other institutions, for hazards reasonably to be foreseen, for risks reasonably to be perceived. (Excelsior Ins. Co. v. State of New York, 296 N. Y. 40; Flaherty v. State of New York, 296 N. Y. 342.)
With respect to the question as to whether a pecuniary loss has been sustained, the court holds that the expert medical testimony has established that there was a possibility of the recovery of the decedent and that such possibility is sufficient to warrant the making of an award herein. (Gould v. State of New York, *366 181 Misc. 884, 46 N. Y. S. 2d 313.) In the latter case the court held that “ A ‘ possibility ’ of recovery is sufficient to warrant the making of an award herein. Presiding Judge Barrett in Liubowsky v. State (Claim No. 25491) held £ that it was possible for him to have recovered sufficiently to leave the hospital, resume his place in society and continue at the vocation in which lie was engaged prior to his confinement ’. That principle was accepted in the affirmance of judgment therein, reported in 260 App. Div. 416, 23 N. Y. S. 2d 633, affirmed by the Court of Appeals in 285 N. Y. 701, 34 N. E. 2d 385.”
The father of the decedent, who maintained an established insurance business, which since has been discontinued, employed decedent m that business. For the year 1950, a joint return filed by decedent and his wife indicated a net income of $4,362.30; for the year 1951, the net income was $3,226.95 and for the year 1952, the net income was $2,643.22. To each of these amounts may be added the approximate sum of $1,000 to reflect paper exemptions which were actually earned income. Thus, the net income for 1950 would have been $5,362.30; for 1951, $4,226.95 and for 1952, $3,643.22. The mental condition of decedent had deteriorated and his earning capacity had decreased, and it is a matter of speculation as to what extent he might have been able to manage his father’s business if he had recovered, or how much he might have been able to earn by himself or as a result of employment by someone else.
In view of all of the foregoing, the court makes no award for conscious pain and suffering for the reason that the stupefying effect of seconal, and the position and condition in bed of the body of decedent when found preclude the assumption that there was pain and suffering. The court awards for pecuniary loss to the next of kin the sum of $25,000 and for funeral expenses the sum of $512.36, making a total award of $25,512.36 with interest thereon as allowed by law. (Decedent Estate Law, § 132; Sutherland v. State of New York, 189 Misc. 953.)
All motions heretofore made by the State on which decision was reserved are hereby denied.
This constitutes the decision of the court in accordance with the provision of section 440 of the Civil Practice Act.
Let judgment be entered accordingly.