Bernard Mahoney, as Administrator of the Estate of Joseph P. Mahoney, Deceased, Claimant, *v*. State of New York, Defendant. (Claim No. 36277.)

Court of Claims, July 11, 1962.

*William G. O'Donnell* for claimant. *Louis J. Lefkowitz, Attorney-General* (*William McCue* of counsel), for defendant.

ALEXANDER DEL GIORNO, J. This is a claim to recover for wrongful death alleged to have been caused by the negligence of the State in permitting the decedent to leave the grounds of Rockland State Hospital at a time when the State knew he was suffering from a self-destructive form of schizophrenia.

The substance of the testimony of James Mahoney, claimant and brother of the decedent, is as follows: the decedent had served in the U. S. Navy during the war and received an honorable discharge in 1946. He had been married in 1951 and was completely normal prior to 1957. He was employed in the family upholstery business, earning a net of about $5,250 annually. On the date of his death, January 29, 1958, he was survived by three infant children. In May, 1957, his wife was confined to a hospital and an exploratory operation revealed that she was suffering from cancer. He thereafter visited her almost daily for a substantial period of time each day, and in July or August his behavior became sharply different from what it had been. His wife died on Labor Day of 1957, and he then began to exhibit delusions. He became convinced that he was suffering from tuberculosis, even though assured by the Board of Health otherwise. He was sent by Dr. Altieri, whom he consulted, to see a psychiatrist, Dr. Hehrlich. After interviewing him, Dr. Hehrlich suggested to the family that decedent should be institutionalized.

On October 27, 1957, with a note from Dr. Altieri, and accompanied by a brother-in-law, decedent went to Bellevue Psychiatric Hospital. The hospital record indicates that he then believed he was possessed by the devil and that he suffered somatic delusions. A form of Bellevue Hospital, dated November 7, 1957, indicated that decedent had lacerations of the left wrist, which statement had not been made in any report at the time of his admission. On that date, on a court certification from Bellevue Hospital, he was admitted to Rockland State Hospital, where he was placed in Ward 16, a Ward of maximum security. The record of the latter hospital, indicates in a physical examination outline, signed by Dr. Bremer of the hospital, that decedent had " 2 scars, left wrist, self-inflicted lacerations." In the admission note, signed by Dr. Vaisberg, is a statement that the decedent at one time, prior to his admission to Rockland, became so guilty and depressed that he attempted to kill himself by taking sleeping pills. Decedent stated that the devil was inside him. Decedent remained in Ward 16 until November 26, 1957, at which time he was transferred to Ward 4, a ward of lesser security. On January 7, 1958, he was transferred to Ward 1,

which was in the nature of a semi-parlor, where he remained until the date of his death.

James Mahoney testified further that he visited his brother from time to time, the first visit being on November 10, 1957, at which time he found him to be in the violent ward. At that time there was issued to him a "Visitor's Pass", which had printed upon it the words: "To entice away or assist a patient to escape from the hospital is a misdemeanor punishable by law". The time of visits was limited, running from 1:00 P.M. to 4:00 P.M. He visited him in that ward again on November 13 and 17; he saw him in Ward 4 on November 24, 28, December 1 and 8. On December 11, 1957, when decedent was still in Ward 4, James testified that he asked Dr. Bremer, who was in charge of the patient, if he could take his brother out on the grounds. The doctor replied that his patient had not been in that ward for a long enough period to allow his being let out, but upon James' insistence, gave him a pass which was to be signed by another doctor. This latter doctor consented, and the patient was let out for a time on that day in the company of James, and was returned to this same doctor. James visited his brother again on December 15.

On December 18, 1957, James requested permission of Dr. Bremer to take his brother home for the Christmas holiday. The doctor replied that this would be impossible and indicated that such privilege could be granted only upon the approval of a board comprised of seven psychiatrists. An attendant suggested to James the use of a pass from 10:00 A.M. to 4:00 P.M. which would be sufficient to permit the patient to be taken home to the Bronx for a holiday visit. James then asked the doctor in charge of the patient if this could be done. The doctor agreed to give an answer later, telling him that if it were done, the patient would have to be returned by 4:45 P.M. On December 22, James returned to the hospital with his brother Bernard, and both were told that the patient's visiting hours had been so changed. On December 25, James, his two brothers and his father called for the patient at 9:30 A.M., and took him home to the Bronx. Later in the same day they returned him to the hospital.

Thereafter, and on December 29, 1957, January 1, 12, 15, 22, and finally January 29, 1958, James again visited the decedent, either alone or with other members of the family, taking him home and then returning him to the hospital. On the visits after January 1, decedent was taken from Ward 1.

On all of these occasions, James testified no pass other than the visitor's pass had been issued to him. This pass permitted him to take his brother from the building to the grounds. On

each of these occasions he also signed a form which, in substance, stated that in consideration of ground parole, the signer agreed to be responsible for the patient and return him to the ward. It is to be noted also that on no occasion was the return time of the patient recorded.

On other occasions, namely, January 5, 19 and 26, 1958, Bernard Mahoney, another brother, came to take decedent home and returned him, the same procedure having been followed.

On January 29, 1958, James called alone for his brother, and proceeded with him toward home. While traversing the Tappan Zee bridge, the decedent suddenly jumped from the car, and despite all efforts of James to prevent him from doing so, jumped from the bridge to his death.

James testified that although he was aware that his brother always wanted to die, he never knew that he had suicidal tendencies.

On cross-examination, he testified that Dr. Bremer, who had direct supervision of the patient, stated it was a good plan to take his brother home to discover his reaction upon being with his family. He admitted that after Christmas Day, he had never asked specifically for permission to take decedent off the grounds. There was introduced into evidence a statement made by James on the day of his brother's death to the State Police. In it he stated that '' we went outside on the grounds and my brother started inquiring about his children and that he wanted to see them: We both decided to start home immediately.''

On redirect, claimant read from the Rockland State Hospital record. The record notes contained a history of the findings of the doctors in Bellevue Hospital, wherein it appeared that decedent was schizophrenic, with a possible tendency to injure himself or others. On January 4, 1958, there was an entry in the notes that patient had homicidal and/or suicidal tendencies and should be watched, as he might hurt himself or someone else; also, that patient had asked other patients to hit him on the jaw. This was signed by John J. White, III, a ward attendant.

The other brother of decedent, Bernard, testified, corroborating generally the testimony of James. He stated also that when he went in with James to see the decedent, he did not need an individual pass, but that both entered on James' pass. He had never seen any lacerations on the wrist of decedent prior to his admission to Bellevue.

Dr. Alfred M. Stanley, Director of Rockland, called as a witness for claimant, testified that the hospital had knowledge of suicidal tendencies of decedent. When asked concerning a fence erected around the grounds with guards at the gates, he stated

that Rockland State is the only mental hospital in the State with a fence and guards. He alleged that this resulted because of public outcries upon prior occasion when a patient had escaped. He explained that Rockland is not a closed hospital, but rather open, in the sense that freedom is given patients to go home, to go out on the grounds and outside to churches and stores; he insisted, however, that the open door hospital theory does not apply in the case of a suicidal patient. His opinion of decedent's prognosis was that it was guarded, that improvement was indicated. He testified that the doctor in charge may or may not instruct a patient's family as to his suicidal propensities, dependent upon his evaluation and assessment of the patient's present apparent tendency or degree of improvement. He indicated that the removal from Ward 16 to Ward 4, and then to Ward 1, denoted improvement in decedent's condition. He pointed out that in Ward 16, patients require close observation; in Ward 4, they require less supervision, and in Ward 1, the least supervision because they do not display any dangerous tendencies. Any doctor, or even the supervising nurse, can admit a patient to Ward 16, when it is obvious that a patient must be protected against himself and others from him. A transfer from Ward 16 to Ward 4, or from Ward 4 to Ward 1, must be made by the doctor in charge, in accordance with his observation of the patient.

The testimony of claimant's psychiatrists was that decedent was a suicidal risk and that he should not have been left alone, permitted ground privileges without a guard present or allowed to go outside the hospital. They stated that decedent would have gotten well in time. They indicated approval of the open door hospital policy for patients who would benefit therefrom.

At the close of claimant's case, the State moved to dismiss on the ground that the negligence of the State had not been established and upon the ground that claimant was not free of contributory negligence. Decision thereon was reserved.

On behalf of the State, two hospital doctors testified that although according to the record decedent had suicidal tendencies, he did not display any overt tendencies and was not apt to commit suicide. They denied that the family of decedent had ever been given permission to take decedent off the grounds. One of them recalled giving permission to decedent's brother to take decedent on the grounds at 10:00 A.M. on December 25. A pass to take a patient off the ground is blue in color; a pass to take a patient about the grounds and a visitor's pass are white in color. Both doctors denied having signed a ground pass. Visits from 10:00 A.M. to 4:00 P.M. are permitted when a patient is in good condition and a relative desires to stay longer than usual.

The superintendent of the New Jersey State Hospital at Greystone Park testified that good normal progress had been made by decedent. He stated that it is good medical practice to give a gradual increase in freedom to a patient; that he himself would have allowed decedent out on the grounds with a relative and without an attendant being present.

At the close of the entire case, the State renewed the motions previously made, decision being reserved.

Knowledge on the part of the hospital authorities of suicidal tendencies of decedent is an element to be considered in determining whether they were negligent in preventing his self-infliction of harm. Reasonable care is required to protect such patients against themselves. (*Hirsh* v. *State of New York,* 8 N Y 2d 125; *Martindale* v. *State of New York,* 269 N. Y. 554; *Gries* v. *Long Is. Home Ltd.,* 274 App. Div. 938.) " The degree of care to be observed is measured by the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution." (*Zajaczkowski* v. *State of New York,* 189 Misc. 299, 302.) The court is satisfied from the evidence adduced upon the trial of this claim that the hospital authorities were aware that the decedent had suicidal propensities.

Accordingly, the question to be resolved is whether the State, charged with such knowledge of the suicidal tendencies of decedent, exercised that degree of care which was reasonable to protect the decedent from the possible consequences of his own acts. The decedent was a patient at the hospital from November 7, 1957 to January 19, 1958, a total of 83 days. During that entire period, there was no overt act of suicide on his part on those occasions when decedent was away from the hospital and at home, a total of eight days, no untoward incident in such direction occurred. Rather, he had progressed from Ward 16, a maximum security ward where he was placed initially on the strength of the Bellevue Hospital record, to Ward 4, a ward of lesser security, and subsequently transferred to Ward 1, a parlor ward of absolute minimum supervision. This was evidence that in the judgment of the hospital authorities, decedent was progressing. The claimant's experts themselves testified that decedent could have recovered in time from his mental illness. On the question of the mental progress of the decedent from the time of his admission to the hospital, the judgment of the hospital authorities must be accepted. While he had been classified originally as a potential suicide, the record discloses clearly that he had improved, and there was no indication that he required any but the care he was being administered for his condition. (*Root* v. *State of New*

*York*, 180 Misc. 205.) One of the claimant's experts, Dr. Wertham, indicated in his testimony that decedent should not have been left alone, although the State cannot be expected to give him constant personal supervision. There was no evidence introduced that he was ever alone, or that he had access to weapons which might have proved dangerous.

We now reach that phase of the case concerning the departure of the decedent from the hospital with his brother on various occasions, as bearing upon the question of negligence of the State. The testimony of decedent's brother James would indicate that the first time decedent was let out upon the grounds was on December 11, 1957, at which time he was in Ward 4, and that the brother returned him to the doctor that same afternoon. The first time James requested permission for decedent to leave the hospital was on December 18, on which date he asked that his brother be allowed to be taken home for Christmas. James testified that although the doctor said such approval could be given only by a board comprised of seven doctors, an attendant suggested the use of a pass from 10:00 A.M. to 4:00 P.M., which would enable the patient to go home for a holiday visit; that when he saw the doctor on December 22, the latter said the decedent's hours had been changed from 10:00 A.M. to 4:00 P.M. On December 25, decedent was taken home and returned to the hospital that day. By his own testimony, this was the only time that James specifically asked permission that decedent be taken home.

On the other hand, Dr. Bremer, the doctor in charge of decedent, testified that James never had permission to take his brother away from the hospital, and that the doctor had no right as resident psychiatrist to issue such a permit. The Rockland State Hospital record contains a form FP12, used when a patient is taken out of the building. This form was signed by James or his brother Bernard on each occasion they visited their brother to take him out of the hospital building. At the head of the form are the words: "In consideration of the Ground Parole of Joe Mahoney a patient in Rockland State Hospital by the Director thereof, the undersigned agrees to be responsible for said patient and return to the Ward at the hour designated below." James signed this 11 times and Bernard 3 times. The visitor's pass used to gain access to the hospital itself, contains words written thereon indicating that any act on the part of the visitor to entice away or assist a patient to escape is a misdemeanor. The ground parole pass states that the visitor may take the patient "about the grounds today only". A pass to take the patient home, different in color from either of these, was never given to or obtained by James or Bernard.

The State has established a standard of care to which it has adhered. The admission of decedent originally to Ward 16 on the basis of the Bellevue report and the examination at Rockland, the transfer to the wards of lesser security as improvement was exhibited, were performed in a manner which has been proved to be the best mental health practice. The evidence also amply indicates that the open door policy, such as is employed at Rockland State Hospital, today is recognized as the foremost method to be employed in the treatment of mental health. This procedure entails the presence of no guard at the gate of the hospital, and claimant has not introduced any evidence which would tend to contradict the efficacy or legality of such procedure.

The evidence sufficiently indicates that the removal of decedent from the hospital on various occasions to his home was consummated without the consent of the hospital authorities. This is borne out particularly by the events occurring on January 29, 1958, the date of death. On that day, after his brother had jumped from the bridge, James Mahoney stated to the State Police that after he and decedent went out upon the hospital grounds, the latter expressed a desire to see his children, whereupon they both decided to start home immediately. No permission to do so was sought or received by James.

So far as the question of the failure of the hospital to apprise decedent's family of any suicidal tendencies is concerned, the court is satisfied that it was well within the province of the authorities not to inform the family of any such proclivities of decedent. The authorities, relying upon their own evaluation and assessment of the progress of decedent, and under all of the existing circumstances, cannot be held to have been remiss in failing so to inform the family.

The court is indeed most sympathetic toward the survivors of decedent, whose plight as a result of this unfortunate occurrence is sincerely to be regretted. We are constrained, however, upon the record, to hold that when the brother of decedent took him out of the hospital grounds on the day of the accident, he did so entirely of his own volition and without any vestige of authority or permission to do so. No act or omission of the State of New York can be considered to have been responsible for that which ensued.

The motions heretofore made by the State at the close of the entire case are hereby granted. The claim is dismissed.