Joseph Modugno, J.
This is a claim for personal injuries and wrongful death as a result of the alleged negligence and wrongdoing of the State by its agents on or about the evening of February 17, 1968. Said claim was filed on January 19, 1970 by the claimant, Harry L. Davis, Sr., father of the deceased who was appointed administrator of the deceased’s estate on May 16,1968.
The incident occurred at Oreedmoor State Hospital, Queens Village, New York.
The claimant alleges that his son, Harry L. Davis, Jr., was a patient at Oreedmoor State Hospital for a number of years, and that on February 18, 1968 claimant received a telegram summoning him to the hospital. Subsequently on February 19, 1968 at about 1:30 p.m. claimant was informed his son had expired. It is claimant’s contention that his son’s death was caused by the wrongful acts of the State: to wit, its agents at Oreedmoor beating the decedent and thereby causing his death. The claimant further alleges that the person or persons who assaulted his son were the servants or agents of the State and were acting within the scope of their employment at the time of the assault which resulted in decedent’s death.
Claimant relies primarily on testimony taken at a hearing held before Dr. L. J. Padula on February 21, 1968 at Oreedmoor State Hospital. Certified copies of the testimony adduced at that hearing were submitted into evidence. The testimony was of three patients and Mr. De Flynn Williams, an employee of the hospital. Although the testimony of Mr. De Flynn Williams was sworn to, the certified copies of the patients’ testimony do not bear the same “ After being duly sworn ” legend.
The testimony of two of the patients, Clifford Carter and David Moultre, is corroborative of each other. The following are the relevant portions of Clifford Carter’s testimony:
Q. What did he do?
A. Well he jumped on him and Harry Davis started to run towards the door and the attendant hit him.
*114 Q. With, what?
A. In his soloflex and he went down.
Q. Where would that be ?
A. (Patient pointed to the pit of the stomach.)
Q. Did Harry say anything?
A. Yes after he was locked up he was saying to himself I don’t want to die, I don’t want to die, but we didn’t pay no attention to him.
Q. Okay. Did you see any blood on Harry Davis?
A. Yes.
Q. Where was it?
A. Blood was coming out of his mouth and coming out of his nose.
Q. Did you see it coming out of his mouth?
A. I seen blood coming out of his mouth and blood coming out of his nose.
Q. You saw blood coming out of both places?
A. Umhum.
David Moultrie in corroborating the testimony of Clifford Carter testified as follows:
A. He was bleeding from the nose and he kept on saying I don’t want to die.
Q. Could the boy’s name have been Harry Davis?
A. Yes Harry Davis. He had like sort of a bald spot right here on the back of his head.
Q. Did he have a bald spot on his head?
A. Yes.
Q. And you saw the attendant on your ward. . .
A. Beating him up.
Q. Who was the attendant?
A. Moore and another one.
Q. How did they beat him up, anything brutal?
A. Well they had him up against the wall. They was punching him.
Q. Where did they punch him?
A. In his stomach.
Claimant also introduced into evidence the report of the autopsy of Harry L. Davis, Jr., which concluded as follows: “ Cause of Death Traumatic rupture of duodenum with retroperitioneal abscess, peritonitis, esopliogitis and pleuritis [sic] Localized blunt force injury of abdomen Undetermined circumstances Henry Siegel M. D.” (emphasis added).
The State does not deny the claimant’s allegations, but instead seeks to have this court deny claimant any recovery by contending that the evidence presented was either inadmissible or insufficient to make out a prima facie case. In support of that position the State cites two cases, Napiearlski v. Pickering (278 App. Div. 456) and Clarke v. Steeplechase Amusement Co. (9 Misc 2d 342) neither of which concerns wrongful death actions.
The State objected to admission into evidence of the certified copies of the testimony taken at the hearing on the grounds the testimony was unsworn. The attorney for tiie State is wrong in assuming that a statement must be sworn to, to be admissible. An affirmation is just as good. I hold that where the following *115 conversation took place, the witness affirmed that what he was testifying to, was the truth. In questioning Clifford Carter, Dr. Padula and the witness engaged in the following conversation.
Q. Do you know what it means to tell the truth?
A. Yes.
Q. What happens if you don’t tell the truth?
Á. Well you are giving lying information and it could foul up whatever investigation that’s on.
Q. What could happen to you for not telling the truth?
A. I can be punished.
Q. You promise that what you tell me now will be the truth?
A. Yes.
I have permitted the introduction of this testimony into evidence by the claimant for several reasons. The certified copies of the testimony taken at the hearing are records kept in the ordinary course of the hospital’s business. The Mental Hygiene Law (§7, subd. [8]) provides as follows: “ 8. The commissioner or any authorised representative of the department may visit, examine, inspect and investigate any state institution, licensed and unlicensed private institution or sanitarium, or part of any hospital or sanitarium, public or private, in which the mentally ill and persons suffering from any mental disease or defect receive care and treatment, and for such purpose the commissioner or such representative is empowered to subpoena witnesses, compel their attendance, administer oaths to witnesses, examine witnesses under oath, and require the production of any books or papers deemed relevant to the inquiry or investigation. A subpoena issued under this section shall be regulated by the civil practice law and rules. ’ ’ (Emphasis added).
Dr. Padula, who was the interrogator at the hearing was the “ assistant director in charge of male employees ” for the hospital. As'-such it was his duty to ascertain if any employees were involved in the death of claimant’s son.
I believe it to be highly improper for the State to object to the introduction of these records. A party cannot seek to exclude testimony which was properly taken and recorded at that party’s direction, and under his direct supervision, on the basis of hearsay or for the lack of an opportunity to cross-examine. In the instant case not only were the affiants (patients) eyewitnesses to the events which resulted in claimant’s son’s death, but the testimony _of these witnesses was taken and recorded under the direction and at the instigation of the party now seeking to have it excluded, the State.
The court is also convinced that the claimant, by his attorney, made every diligent effort to obtain knowledge of the where *116 abouts of the affiants in order to secure their testimony at the trial of this claim, but was unsuccessful.
Claimant did move for and did hold an examination before trial of a person produced by the State as having knowledge of the facts and circumstances surrounding intestate’s demise. Not only did not the witness called by the State for the examination before trial admit to being familiar with the facts and circumstances surrounding the death (vis-a-vis the hearing), but the State failed to have available necessary records as was required by the motion and the order pursuant thereto. The transcript of the examination before trial is only too clear as to the lack of co-operation received by claimant’s attorney of the witness produced when it is read with the knowledge that the witness was the same Dr. Padula who two days after the incident conducted the hearing referred to above.
The following are excerpts from that transcript:
Q. Prior to this hearing, did Williams make a report to the hospital as to any-alleged injuries suffered by Harry Davis, Jr.?
Mr. McCue: Off the record.
(Discussion off the record.)
A. I wouldn’t know. I would only know if someone called my attention to it.
Mr. McCue: Off the record.
(Discussion off the record.)
Q. Was it standard operating procedure that if, for example, a patient got hurt in any way not connected with an assault, that the ward man makes a record?
A. Any accident or injury to a patient is recorded in the Ward Accident Book.
Q. Of course, you haven’t got a Ward Accident Book with you now?
A. No.
Q. That is kept by the ward or at least kept in the ward and eventually the book goes into the flies ?
A. Yes.
Q. Who among the employees can administer Thorazine?
A. No such thing, thorazine.
Q. Do you know any chemical drug or other medicine which is spelled, thorazine?
A. Not that I know of.
Mr. Bailey: Off the record.
(Discussion off the record.)
Q. What employees can administer that in a hospital?
A. It is given by anyone of the employees under the direction of the written order of the doctors.
The lack of co-operation becomes even more apparent with the knowledge that Dr. Louis J. Padula, a licensed psychiatrist, had in fact questioned Mr. De Flynn "Williams about the accident, and at that time had questioned Williams about his unauthorized use of thorazine on patients.
The State of New York by the provisions of section 8 of the Court of Claims Act waived its traditional immunity from liabil *117 ity for negligence of its agents in its charitable and other institutions, thus transforming what had been an unenforceable moral obligation into an actionable legal right.
It appears somewhat incongruous for the State to take steps to block the enforcement of this legal right and to deny recovery in a case such as the one at bar where its agents have overwhelming proof in their possession as to the validity of the claim.
The refusal of some witnesses, having knowledge of the fateful events, to testify at an examination before trial, the failure of the State to produce at such examination the “ Ward Accident Book ’ ’, the inability of claimant to secure information about his son’s death (either from the hospital authorities or from the Grand Jury which investigated this matter), and the uncooperative testimony of Dr. Padula seem to spell out a lack of co-operation and serious attempts on the part of the State to prevent claimant from recovering.
At the time of trial the attorney for the State conceded that if a physician were called to testify he would testify that the trauma sustained by claimant’s son on February 17, 1968 was the competent producing cause of his death.
My position in this case finds strong support in Noseworthy v. City of New York (298 N. Y. 76, 80-81) where the Court of Appeals reiterated the rule applicable hereby by stating: 1 ‘ But the recent cases do not limit this liberality to the question of contributory negligence, and say that in a death case a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence (McBride v. Brady, 234 App. Div. 882; Herbert v. Smith Paper Corp., 243 App. Div. 260, 263; Frate v. State of New York, 245 App. Div. 442, 445). We think that is sound and right. It is based on the ‘ consideration ’ mentioned in Griff en v. Manice (166 N. Y. 188, 193-194) that where the management and control of the thing which has produced the injury is exclusively vested in the defendant, it is within his power to produce evidence of the actual cause that produced the accident, which the plaintiff is unable to present. ’ Griffen v. Manice (supra) goes on to say (166 N. Y. at p. 194) that it is a general rule of evidence, applicable to every sort of case, ‘ that where the defendant has knowledge of a fact but slight evidence is requisite to shift on him the burden of explanation’ ”.
The State rested at the end of the claimant’s case and failed to go forward with any proof or explanation. I find that claimant has sustained his burden of proof in that the injuries and subsequent death of decedent were caused solely as the result *118 of the State’s negligence and that there is no evidence of contributory negligence on the part of the decedent.
Although the proof elicited by claimant is limited, this court is so thoroughly convinced of the truth of that which has been elicited and the legitimacy and validity of this claim that to dismiss it would, in my opinion, constitute a gross miscarriage of justice.
There is no question but that the deceased from the time he was assaulted until shortly before his death, two days later, suffered pain. The medical records indicate that he had to be restrained and there are statements to the effect that he called out “ I don’t want to die ”. For the pain and suffering which the deceased was made to endure while alive I award the sum of $2,500.
The only special damages proven were for the funeral expenses and accordingly I award the claimant $750.
In considering the award to be made for wrongful death, I must take into account that the deceased had been institutionalized since he was 12, or for some 3 years, and that although he was loved by his parents the prospects of his being able to return the companionship and affection which a normal child is capable of, were slight. In fact, there was the possibility that he would have to be institutionalized for the remainder of his natural life. I hereby award the claimant for the wrongful death of the decedent the sum of $7,500.
Claimant shall have judgment for the total amount of $10,750 of which $750 represents funeral expenses, $7,500 represents damages on the claim for wrongful death, and $2,500 is awarded on the claim for conscious pain and suffering. Interest on the sum of $8,250 shall be computed from February 19, 1968 to November 16, 1968 and from January 19, 1970 to the date of entry of judgment herein.
All motions made at the time of trial which were not otherwise disposed of are hereby denied.